UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Debra Faye Pierce,** | **Court File No.: 22-cv-00441 (PJS/LIB)** |
| **Plaintiff,** | |
| vs. | **PLAINTIFF'S STATEMENT OF THE CASE** |
| **Itasca County, et al.,** | |
| **Defendants.** | |

## INTRODUCTION

Plaintiff Debra Faye Pierce is the mother of Danica G. Winslow. Ms. Winslow died while in the custody of Itasca County Jail in March of 2018. She was 36 years old.

Ms. Winslow was suffering from infective endocarditis, a serious but treatable medical condition. After being ignored and neglected by jail and medical staff, Ms. Winslow's infection spread to her lungs and led to respiratory distress, septic shock, and, ultimately, her death. After conducting a comprehensive independent investigation, Ms. Pierce filed the present lawsuit against three separate entities responsible for Ms. Winslow's untimely death. The Defendants include Itasca County and its staff, Advanced Correctional Healthcare and its staff, and Grand Itasca Clinic and Hospital and its staff. The factual basis for Plaintiff's legal claims is outlined in detail below.

## STATEMENT OF FACTS

**From Emergency Room to Jail**

On March 22, 2019, Ms. Winslow was staying with a friend in Calumet, Minnesota when she developed severe back pain and weakness and was unable to get up from the floor. An

ambulance was called and she was taken to the Emergency Room of Grand Itasca Clinic and Hospital ("GICH").

At the GICH emergency room, Ms. Winslow was noted to have severe back pain with difficulty moving on her own. Her heart rate was somewhat rapid and her oxygenation was slightly diminished. She was noted to be very dehydrated, which was treated with intravenous fluids. It was noted in her record that Ms. Winslow was a heroin user. X-rays of her back were normal and she was released with final diagnoses of "acute exacerbation of chronic low back pain" and "polysubstance abuse."

During the call for the ambulance, the Itasca County 911 dispatcher checked to see if Ms. Winslow had any outstanding warrants. When it was learned that she had an outstanding warrant for missing a court appearance, Itasca County Sheriff's Deputy Corey Rondeau was dispatched to meet the ambulance at the home and follow it to GICH. Upon discharge from the emergency room, Deputy Rondeau arrested and transported Ms. Winslow to the Itasca County Jail.

**A Second Trip to the Emergency Room**

Ms. Winslow was booked into the Itasca County Jail at just after 10:30 pm on March 22, 2019. Videos of the booking process show that she was pale, experiencing pain and appeared to have some difficulty breathing. During her jail intake, Corrections Officer Schofield specifically noted receipt of Ms. Winslow's GICH discharge instructions.

On March 23, 2019 at 11:36 am, Corrections Officer Slettom noted that Ms. Winslow had urinated on her clothing and that she was unable to get up to get to the toilet. Ms. Winslow declined help getting up because she was in pain. CO Slettom states in her note that "She was cleared medically for jail. I told her they [GICH] would not have cleared her if she could not be here." Shortly thereafter, at 11:45 am, Ms. Winslow was examined by Dr. Travis Schamber who

2

found that Ms. Winslow was suffering from severe pain (ranked "9/10"), had low blood pressure, a rapid pulse, and low oxygenation. He ordered an ambulance transport to the emergency room.

The run record for the ambulance service that transported Ms. Winslow to GICH noted that Ms. Winslow was found on the floor crying from severe pain that had been unrelieved by the medications prescribed by the emergency room physician during her March 22 visit. She was unable to get up from the floor. Her blood pressure and oxygenation were low.

In the GICH emergency room, Ms. Winslow was seen by Defendant Sherlock, a Physician Assistant. Defendant Sherlock reviewed the medical records from the emergency room visit of the day prior and performed a cursory physical examination, finding rapid heart rate and diminished oxygenation. Despite this, no diagnostic testing or imaging was ordered. Defendant Sherlock ordered pain medications and discharged Ms. Winslow back to the jail.

Discharge instructions from this emergency room visit included the following:

> CALL 911
> Call emergency services if any of the following occur:
> - Trouble breathing
> - Confusion
> - Very drowsy or trouble awakening
> - Fainting or loss of consciousness
> - Rapid or very slow heart rate
> - Loss of bowel or bladder control

Ms. Winslow was returned to the Itasca County Jail at 4:44 pm that day, where Defendant Slettom noted, "Still moving slow. Got her lifted into the bed. Given an extra mattress and two blankets upon return from the ER. Dianna Kachinske notified." Defendant Kachinske, a Certified Nurse Practitioner, signed orders for the medications prescribed at the GICH Emergency Room. However, Defendant Kachinske did not examine Ms. Winslow after she returned from the emergency room, an essential nursing practice to document a baseline of the patient's condition to allow recognition of changes in condition and to develop a plan of care.

Further, Defendant Kachinske did not direct other nursing staff to perform the necessary assessment or develop a care plan for Ms. Winslow.

**March 24, 2019 -- Illness Worsens in the Jail**

At 5:27 am on March 24, 2019, Defendant Nelson reported that Ms. Winslow "took off all clothing except for her bra throughout the night. Was given water a couple of times on our shift as she claims she couldn't get up to get it herself." This information was not reported to any medical staff. At 7:15 am that day, Defendant Slettom noted that Ms. Winslow's bed smelled of urine and that she was naked from the waist down at shift change. She also noted that Ms. Winslow had not left the bed since returning from the emergency room the prior afternoon. Ms. Winslow begged to be taken back to the emergency room. This information and the request to return to the emergency room was not reported to any medical staff.

At 8:32 am that day, Defendant Slettom noted that Ms. Winslow was screaming in pain and "refusing to attempt to get up." She added, "Says she can't move." This information was not reported to any medical staff. At 8:42 am that day, Defendant Slettom noted that Ms. Winslow was "banging on the wall again." Given that a mere 10 minutes prior, Ms. Winslow had been screaming in pain, banging on the wall was likely an attempt to get help for her medical condition. This information was not reported to any medical staff. At 9:12 am that day, Defendant Latvala noted that the emergency room discharge instructions "says return to the ER if you have worsening symptoms such as loss of bowel or bladder function, numbness or tingling in your groin area or fevers."

Defendant Latvala notified Defendant Kachinske that Ms. Winslow was urinating on herself because she was stating she could not get out of bed. Defendant Latvala reported that Defendant Kachinske told him Ms. Winslow was able to control her bladder and was just

4

choosing to urinate on herself. Defendant Kachinske's opinion was not based on any examination of Ms. Winslow. Defendant Kachinske advised Defendant Latvala to contact Defendant Jail Captain Lucas Thomas to determine if Ms. Winslow was fit for jail. Upon information and belief, Defendant Thomas does not have medical training. Defendant Latvala wrote that Defendant Thomas told him that if GICH released her, she is fit for jail and that a deputy should go to Walgreens to purchase adult diapers.

At 10:07 that morning, Defendant Slettom delivered an adult diaper and a sheet to Ms. Winslow. She noted that Ms. Winslow asked to take a shower and asked to be returned to the emergency room. At 12:50 pm that day, Defendant Slettom went to Ms. Winslow's cell with a wheelchair to attempt to get her up to take a shower. Defendant Slettom wrote that Ms. Winslow "insisted I call an ambulance and Grand Itasca [GICH] should run 100 tests until they figure out what's wrong with her." Defendant Slettom offered a washcloth, soap and towel but Ms. Winslow declined, stating instead that she needed to go to the emergency room. Instead of notifying medical staff, Defendant Slettom left clean clothes and a sheet in the cell and left.

At 4:58 pm that afternoon, Defendant Nelson noted that Ms. Winslow complained about her cell being too hot. Ms. Winslow may have been dehydrated or may have been experiencing a fever. This information was not reported to any medical staff. At 10:00 pm that night, Defendant Nelson gave Ms. Winslow water. She noted that Ms. Winslow stated she was unable to roll over or move but was seen moving very slowly. This information was not reported to any medical staff.

**March 25, 2019 – Continued Health Deterioration**

The next morning, on March 25, 2019 at 6:13 am, Defendant Olson noted that Ms. Winslow's cell smelled of urine. Ms. Winslow had been lying on mats on the floor. Defendant

Olson told her to clean up the cell and to "get moving" because she had court that day. This information was not reported to any medical staff. At 7:13 that morning, Defendant Olson stated that Ms. Winslow was "rolling around on the floor" and that the sheets and blanket were full of urine. Ms. Winslow requested a wheelchair. Later that morning, Defendant Olson pulled Ms. Winslow's body out to the table in the day room so that Ms. Winslow could attempt to use the table to try to pull herself up into a wheelchair. Ms. Winslow did not have the physical strength to do so and was unsuccessful. Instead, Defendants Imbleau and Freschette assisted Defendant Olson to pull Ms. Winslow up into the chair. None of this information was reported to any medical staff.

That afternoon, Ms. Winslow slid out of the wheelchair to the floor, unable to get back into the chair. Correction staff removed the wheelchair and left Ms. Winslow on the floor, pulling on her legs to slide her back into her cell. This information was not reported to any medical staff.

**March 26, 2019 – The Death of Ms. Danica G. Winslow**

By the morning of March 26, 2019, Ms. Winslow's condition continued to deteriorate. At 6:40 am, she refused breakfast. At 8:43 am Defendant Freschette noted that Ms. Winslow's breathing seemed labored and he requested Defendant Pellersels to check Ms. Winslow.

Shortly thereafter, three days after being seen in the GICH emergency room, Ms. Winslow was finally evaluated by Defendant Pellersels, a Registered Nurse. Defendant Pellersels noted that Ms. Winslow had been lying on the floor on her left side with little movement since the day prior and that Ms. Winslow reported that she hurt all over. Ms. Winslow's vital signs showed a rapid heart rate and decreased oxygenation. She noted that Ms. Winslow's lips were extremely chapped, a sign of dehydration. Defendant Pellersels reported

this information to Defendant Kachinske. Defendant Pellersels also requested additional information from GICH.

At 12:03 pm, Ms. Winslow refused her lunch tray, telling Defendant Freschette that she was unable to get up and needed medical attention. Defendant Freschette summoned Defendant Pellersels to Ms. Winslow's cell. Defendant Pellersels arrived in Ms. Winslow's cell about two hours later and found that Ms. Winslow's condition had become critical, with a blood pressure of 98/52, pulse of 125-132, respiration rate of 42, and an oxygenation level of 88%. She noted that Ms. Winslow appeared sick looking with skin that was pale and cool and clammy to touch, that her speech was slurred, and that she had audible stridor (noisy breathing). Defendant Pellersels called for ambulance at approximately 2:20 pm.

An ambulance transported Ms. Winslow to GICH. By then, her oxygenation had decreased to 78% and she was hallucinating. During the emergency room visit at GICH, Ms. Winslow was found to have infectious material in her lungs, abnormal blood clotting, and she was in septic shock. She was airlifted to St. Mary's Essentia Hospital, a higher acuity facility. At St. Mary's Essentia Hospital, Ms. Winslow was found to have acute respiratory failure and severe septic shock. Despite extensive resuscitation efforts, Ms. Winslow died at 7:52 pm that night.

An autopsy showed that Ms. Winslow died from infective endocarditis with bacterial infection and vegetation (growths) around the tricuspid valve, the heart valve that regulates blood flow from the heart to the lungs. This infection spread into Ms. Winslow's lungs and led to respiratory distress and septic shock. Infective endocarditis is an infection of the lining of the heart, including heart valves. According to medical research, infective endocarditis (IE) is a notorious complication of intravenous drug use and typically affects the cardiac valves. Among

these, the tricuspid is the most common affected valve, although the mitral and/or aortic valves can also be involved. Detection of IE is through echocardiogram, blood cultures, and recognition of the symptoms.  Symptoms of infective endocarditis include chest pain (often radiating to the back in women), aching joints and muscles, shortness of breath, fatigue, and sometimes swelling of the ankles and feet.

During her GICH Emergency Room visit of March 23, 2019, Ms. Winslow reported non-specific back pain and other symptoms indicative of IE.  It was also noted in her records at the hospital that she was a heroin user.  Had Defendant Sherlock more thoroughly assessed Ms. Winslow, admitted her for observation, and ordered appropriate testing for the known risk of IE, Ms. Winslow's condition would have been properly diagnosed and she would have been admitted to the hospital for treatment.  Instead, Defendant Sherlock falsely diagnosed Ms. Winslow with "low back pain without sciatica" and discharged her to jail where she continued to suffer in agonizing pain.

After her return to the jail from the GICH Emergency Room on March 23, 2019, Ms. Winslow spent most of her time over the next four days on the floor of her jail cell, unable to get up even to go to the bathroom.  This was repeatedly noted by individual Itasca County Defendants.  These Corrections officers had access to the discharge instructions from the March 23rd emergency room visit, which included a list of conditions requiring a return to the emergency room.  Despite clear signs of urinary incontinence and breathing irregularities, individual Itasca County Defendants mostly failed to report this information to medical staff and all failed to take action to return Ms. Winslow to the emergency room.  Had Ms. Winslow been returned to the emergency room timely, her condition would likely have been diagnosed and she would have received the care necessary to survive her condition.

After Ms. Winslow returned to the jail from the emergency room, she was not seen timely by any of individual ACH Defendants and, thus, was given no assessment or treatment plan. After returning from the emergency room, Ms. Winslow was not seen by any individual ACH Defendants until the day of her death. The standard of care for correctional medical staff includes the provision of an assessment of an individual who was seen in an emergency room to establish a baseline for recognizing changes in medical condition and a care plan based on emergency room discharge orders and the patient's medical needs. None of the individual ACH Defendants performed an assessment or developed a care plan for Ms. Winslow. Had any of the individual ACH Defendants assessed Ms. Winslow timely after her emergency room visit or created a care plan, Ms. Winslow's deteriorating condition would have been recognized sooner and she would have received lifesaving medical care.

Defendant Kachinske was notified on March 24, 2019 by a Corrections Officer that Ms. Winslow had developed one of the symptoms listed on the emergency room discharge instructions as requiring a return to the emergency room. Without examining Ms. Winslow, Defendant Kachinske determined that Ms. Winslow was choosing to urinate on herself. She instructed the Corrections Officer to contact a jail administrator—someone with no medical background—to determine if Ms. Winslow was fit for jail. Had Defendant Kachinske performed an assessment on Ms. Winslow, she would have found that Ms. Winslow was in need of emergency medical care, leading to a return to the hospital for diagnosis and lifesaving treatment.

Defendant Pellersels finally assessed Ms. Winslow at about 8:45 am the morning of March 26, three days after Ms. Winslow was returned to jail from the emergency room. During her assessment, she noted that Ms. Winslow had been lying on the floor on her left side with

little movement since the day prior and that Ms. Winslow reported that she hurt all over. She noted that Ms. Winslow's vital signs included a rapid heart rate, decreased oxygenation and signs of dehydration. Medical records indicate that Defendant Pellersels was aware that Ms. Winslow was an IV drug user. Despite these findings, Defendant Pellersels left Ms. Winslow in her cell while she made telephone calls and got additional records from GICH. Defendant Pellersels only took action to address Ms. Winslow's condition approximately four hours later, after she was summoned to Ms. Winslow's cell by Defendant Freschette. Even then, it took two hours for Defendant Pellersels to respond. By that time, Ms. Winslow was in respiratory failure and septic shock.

Although Defendant Pellersels summoned an ambulance at approximately 2:20 pm, it was too late to save Ms. Winslow's life. Had Defendant Pellersels performed the necessary assessment of Ms. Winslow after her return from the emergency room and created an appropriate treatment plan, changes in Ms. Winslow' condition would have been recognized sooner. Had Defendant Pellersels acted on her initial findings rather than waiting hours and acting only after being alerted by Defendant Freschette of serious changes to Ms. Winslow's condition, Ms. Winslow would likely have survived.

## **LEGAL CLAIMS**

Ms. Pierce is suing the Itasca County and Advanced Correctional Healthcare Defendants for Eighth and/or Fourteenth Amendment deliberate indifference. Ms. Pierce is suing Advanced Correctional Healthcare and Grand Itasca Clinic and Hospital for medical malpractice, and she is suing all defendants for wrongful death. Ms. Pierce's claims are brought pursuant to 42 U.S.C. § 1983 as well as Minnesota state law. Ms. Pierce is seeking damages for Ms. Winslow's

physical/emotional pain and suffering as well as wrongful death damages pursuant to Minnesota state law.

                                                THE LAW OFFICE OF ZORISLAV R. LEYDERMAN

Dated: May 31, 2022                        By: s/ Zorislav R. Leyderman
                                                     ZORISLAV R. LEYDERMAN
                                                     Attorney License No. 0391286
                                                     Attorney for Plaintiff
                                                   The Law Office of Zorislav R. Leyderman
                                                   222 South 9th Street, Suite 1600
                                                   Minneapolis, MN 55402
                                                   Tel: (612) 876-6626
                                                   Email: zrl@ZRLlaw.com