## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Debra Faye Pierce, | Court File No. 22-cv-00441 (JMB/LIB) |
| Plaintiff, | PLAINTIFF'S MEMORANDUM OF |
| | LAW IN OPPOSITION TO |
| vs. | DEFENDANTS' MOTIONS FOR |
| | SUMMARY JUDGMENT |
| Itasca County, et al., | |
| Defendants. | |

## STATEMENT OF GENERAL FACTS[1] [2]

*1.    March 22, 2019: From Emergency Room to Jail.*

On March 22, 2019, Ms. Winslow was staying with a friend in Calumet, Minnesota when she developed severe back pain and weakness and was unable to get up from the floor. (Compl., Doc. No. 39, p. 4 ¶14.) An ambulance was called and she was taken to the Emergency Room of Grand Itasca Clinic and Hospital ("GICH"). (Compl., Doc. No. 39, p. 4 ¶14; Ex. 1, Bates 154.)

At the GICH emergency room, Ms. Winslow was noted to have severe back pain with difficulty moving on her own. (Ex. 2, Bates 128.) Her heart rate was somewhat rapid and her oxygenation was slightly diminished. (Ex. 2, Bates 130.) She was noted to be somewhat dehydrated, which was treated with intravenous fluids. (Ex. 2, Bates 134.) It

---

[1] The exhibits cited in this Statement of Facts reference the accompanying Declaration of Zorislav R. Leyderman and the exhibits attached thereto.

[2] Given Plaintiff's burden to establish individualized liability for each Defendant, a more detailed factual recitation of the facts from the perspective of each Defendant is provided in Argument Section I.D. below.

was noted in her record that Ms. Winslow was a heroin user. (Ex. 2, Bates 128.) X-rays of her back were normal and she was released with final diagnoses of "acute exacerbation of chronic low back pain" and "polysubstance abuse." (Ex. 2, Bates 133-34.)

During the call for the ambulance, the Itasca County 911 dispatcher checked to see if Ms. Winslow had any outstanding warrants. (Ex. 3.)  When it was learned that she had an outstanding warrant for missing a court appearance, Itasca County Sheriff's Deputy Corey Rondeau was dispatched to meet the ambulance at the home and follow it to GICH. (Ex. 3.) Upon discharge from the emergency room, Deputy Rondeau arrested and transported Ms. Winslow to the Itasca County Jail. (Ex. 3.)

Surveillance video from March 22 shows Ms. Winslow arriving to the jail as well as the booking process. (Ex. 100, 3-22-19 Bottom Stairs, 18:57-18:58; Ex. 100, 3-22-19 Booking, 22:29-23:16.) When she arrived to the jail and during booking, Ms. Winslow is able to walk, stand, and mobilize on her own without assistance. (Ex. 100, 3-22-19 Bottom Stairs, 18:57-18:58; Ex. 100, 3-22-19 Booking, 22:29-23:16.)

## 2.    *March 23, 2019: Second Trip to the Emergency Room.*

Ms. Winslow was booked into the Itasca County Jail at just after 10:30 pm on March 22, 2019. (Ex. 4.) On March 23, 2019 at 11:36 am, Corrections Officer Slettom noted that Ms. Winslow had urinated on her clothing and that she was unable to get up to get to the toilet.  (Ex. 5, Bates 34; Ex. 6, Bates 28.) Ms. Winslow declined help getting up because she was in pain. (Ex. 5, Bates 34.) CO Slettom states in her note that "She was cleared medically for jail.  I told her . . . [GICH] would not have cleared her if she could not be here." (Ex. 5, Bates 34.)

2

Shortly thereafter, at 11:45 am, CO Slettom completed a medical protocol and consulted with Dr. Travis Schamber. (Ex. 6, Bates 28.) The medical protocol included CO Slettom taking Ms. Winslow's blood pressure, temperature, asking simple medical questions about how Ms. Winslow felt at the time, and then reporting this information to Dr. Schamber. (Ex. 101, p. 12-13.) Dr. Schamber was advised that Ms. Winslow was suffering from severe pain (ranked "9/10"), had low blood pressure, a rapid pulse, and low oxygenation. (Ex. 7, Bates 57.) Dr. Schamber ordered an ambulance transport to the emergency room. (Ex. 6, Bates 28; Ex. 7, Bates 57.) An ambulance was called and Ms. Winslow was transported back to the GICH emergency room for another evaluation. (Ex. 6, Bates 28; Ex. 8.)

In the GICH emergency room, Ms. Winslow was seen by Alexander Sherlock, a Physician Assistant. (Ex. 2, Bates 135-138.) Mr. Sherlock reviewed the medical records from the emergency room visit of the day prior and performed a cursory physical examination, finding rapid heart rate and diminished oxygenation. (Ex. 2, Bates 135-138.) Despite this, no diagnostic testing or imaging was ordered. (Ex. 2, Bates 135-138.) Mr. Sherlock ordered pain medications and discharged Ms. Winslow back to the jail. (Ex. 2, Bates 135-138.) Discharge instructions from this emergency room visit were printed on March 23, 2019, at 3:43 PM and included the following:

**CALL 911**

Call emergency services if any of the following occur:

- Trouble breathing
- Confusion
- Very drowsy or trouble awakening

3

- Fainting or loss of consciousness
- Rapid or very slow heart rate
- Loss of bowel or bladder control

(Ex. 9, Bates 95-96.)

Ms. Winslow was returned to the Itasca County Jail at 4:44 PM that day, where CO Slettom noted, "Still moving slow. Got her lifted into the bed. She was worried about if she missed supper or not. She was glad to hear she did not." (Ex. 5, Bates 33.) One minute later, at 4:45 PM, CO Slettom noted, "Given an extra mattress and two blankets upon return from the ER. Dianna Kachinske notified. Pain patch approved and will be removed tomorrow." (Ex. 5, Bates 33.)

### 3.    *March 24, 2019: Ms. Winslow's Illness Worsens in the Jail.*

At 5:27 am on March 24, 2019, CO Erin Nelson reported, "[Ms. Winslow] took off all clothing except for her bra throughout the night.  Was given water a couple of times on our shift as she claims she couldn't get up to get it herself." (Ex. 5, Bates 33.)

At 7:15 am that day, CO Slettom noted that Ms. Winslow's bed smelled of urine and that she was naked from the waist down at shift change.  She also noted that Ms. Winslow had not left the bed since returning from the emergency room the prior afternoon.  Ms. Winslow demanded to be taken back to the emergency room. (Ex. 5, Bates 33.)

At 8:32 am that day, CO Slettom noted that "[Ms. Winslow] was screaming in pain [and] refusing to attempt to get up." (Ex. 5, Bates 33.)  She added, "Says she can't move." (Ex. 5, Bates 33.)   At 8:42 am that day, Defendant Slettom noted that Ms. Winslow was "banging on the wall again." (Ex. 5, Bates 33.)

At 9:12 am that day, Sgt. Latvala entered the following notation into the jail record:

> ER release paperwork says return to the ER if you have worsening symptoms such as loss of bowel or bladder function, numbness or tingling in your groin area or fevers. I called the on call NP Dianna [Kachinske] and informed her that Winslow is urinating on herself because she states she cannot get up to go to the bathroom. NP Diana said Winslow is able to control her bladder but is just choosing to urinate on herself because she says she cannot get up. NP Dianna wanted me to call Captain Lucas Thompson to see if Winslow is fit for jail. Lucas said that if the Grand Rapids ER released her and said she is fit for jail then yes. Lucas said to have a road deputy go get depends at Wal-greens or get them when the inmates are lock down.

(Ex. 5, Bates 33.) At 10:07 that morning, CO Slettom delivered an adult diaper and a sheet to Ms. Winslow. The following exchange occurred during this encounter: "[Ms. Winslow] screamed at me that she wanted to go to the ER and wanted a shower. When I reentered the cell, she had thrown the sheet and Depends on the floor." (Ex. 5, Bates 32.)

At 12:50 pm that day, Defendant Slettom went to Ms. Winslow's cell with a wheelchair to attempt to get her up to take a shower.  Defendant Slettom wrote that Ms. Winslow "insisted I call an ambulance and Grand Itasca [GICH] should run 100 tests until they figure out what's wrong with her and it's her right to go there 10 times a day if that's what it takes." (Ex. 5, Bates 32.) Defendant Slettom offered a washcloth, soap and towel but Ms. Winslow declined, "stating that she had to go to the ER". (Ex. 5, Bates 32.) Defendant Slettom left clean clothes and a sheet in the cell and left. (Ex. 5, Bates 32.)

At 10:00 pm, Ms. Winslow complained to Sgt. Nelson that "she can't roll over or move." (Ex. 5, Bates 32.) Sgt. Nelson reported that Ms. Winslow "was seen rolling over,

5

rolling off and on to mat, very slow movements but more than she is claiming she can do. Subject refused offers of help to shower." (Ex. 5, Bates 32.)

**4.** ***March 25, 2019: Ms. Winslow Spends the Day Rolling Around on the Floor Soiled in Urine.***

At 4:56 am on March 25, Sgt. Nelson noted, "[Ms. Winslow] was yelling that it was too hot in her cell. She was able to roll over towards the toilet." (Ex. 5, Bates 32.) Officer Frechette logged noticing Ms. Winslow "laying on the floor unclothed" in her cell. (Ex. 6, Bates 22.) At 6:13 am, CO Olson had an encounter with Ms. Winslow and logged the following information:

> Told her that [she] needs to get moving and get dressed along with cleaning her cell that smells of urine. She said she needs to go to the bathroom[.] I told her that I'd help but she needs to pick up her used depends diapers and garbage. She said she does not need help[.] I told her to get moving[,] she has court today and I am not gonna be dealing with her mess all morning.

(Ex. 5, Bates 32.)

At 7:13 that morning, CO Olson logged the following entry:

> Since Winslow rolls around on [the] floor [and] refuses any help to get her dressed. I cleaned her cell and helped her put a shirt on. I took out her sheets and blanket for they were full of urine. She wanted the wheel chair and I told her she needs to get dressed. Gave her breakfast and told her to not throw it on the floor for I just cleaned it.

(Ex. 5, Bates 32.) At 11:45 am, CO Olson logged that Ms. Winslow "could not pull herself up" into a wheelchair and it took a total of 3 officers (CO Olson, CO Frechette, and CO Imbleau) to "lift[] her up into the chair." (Ex. 5, Bates 31-32.) Officer Frechette also reported that Ms. Winslow "could not pull herself up" and that it took three officers to lift Ms. Winslow into a chair. (Ex. 6, Bates 22.)

At 3:41 pm, CO Olson logged that Ms. Winslow "slid off the wheelchair and layed on the floor [and that the] [w]heelchair [was] taken out of cell." (Ex. 5, Bates 31.) Sgt. Frechette also logged that Ms. Winslow "[s]lid off the wheelchair and laid on the floor" at 3:41 pm. (Ex. 6, Bates 22.) At 5:16 pm, CO Olson logged that Ms. Winslow was "[s]till rolling around on floor. She asked if I could pull on her legs and pull her into the cell. I did and then pushed her up right in a sitting position." (Ex. 5, Bates 31.)

**5.**      ***March 26-27, 2019: The Death of Ms. Winslow.***

On March 26, 2019, Sgt. Frechette noted that Ms. Winslow was "sleeping on the floor as we began our shift [at 6 am]." (Ex. 6, Bates 22.) At 6:50 am, Ms. Winslow refused breakfast. (Ex. 5, Bates 31; Ex. 6, Bates 22.) At 8:43 am, Sgt. Frechette noted that Ms. Winslow's breathing was labored and he requested that Nurse Pellersels check on Ms. Winslow. (Ex. 5, Bates 31; Ex. 6, Bates 22.)

Shortly thereafter, three days after being seen in the GICH emergency room, Ms. Winslow was finally evaluated by Nurse Pellersels, a Registered Nurse. (Ex. 7, Bates 64.) Defendant Pellersels noted that Ms. Winslow had been lying on the floor on her left side with little movement since the day prior and that Ms. Winslow reported that she hurt all over. (Ex. 7, Bates 64.) Ms. Winslow's vital signs showed a heart rate of 112 beats per minute, 92% oxygenation, and respiration of 22 breaths per minute. (Ex. 7, Bates 64.) Nurse Pellersels noted that Ms. Winslow had "significantly chapped lips." (Ex. 7, Bates 64.) Nurse Pellersels reported this information to NP Kachinske. (Ex. 7, Bates 64.) According Nurse Pellersels' chart, NP Kachinske requested more history on Ms. Winslow, at which point Nurse Pellersels had Ms. Winslow complete an authorization

form (ROI) and she sent it to GICH "where she was seen in the ER x2." (Ex. 7, Bates 64.)

At 12:03 pm, Ms. Winslow had an encounter with Sgt. Frechette: "[Subj. refused her lunch tray, stating that she can't get up, and needs medical attention. I informed ACH Nurse Jen [Pellersels] about this, who then came back to the cell with me, got a release of information, and some more background on subj." (Ex. 5, Bates 31.) Sgt. Frechette also documented being advised that Ms. Winslow was "unable to get up and eat." (Ex. 6, Bates 22.) Sgt. Frechette documented the same information in his incident report. (Ex. 6, Bates 22.) CO Frechette's documentation shows that, despite having an encounter with Ms. Winslow around 9:00 am, Nurse Pellersels did not obtain the ROI authorization until around noon, which was more than 3 hours later. (Ex. 5, Bates 31; Ex. 6, Bates 22.) Eventually, medical records were faxed in from GICH, but those records show that they were printed at 12:46 pm on March 26. (Ex. 15.)

At 1:43 pm, CO Olson was in Ms. Winslow's cell and offered to move her. (Ex. 6, Bates 24.) CO Olson was unable to move Ms. Winslow on her own and radioed for help and also requested for Nurse Pellersels to come check on Ms. Winslow. (Ex. 6, Bates 24.) Nurse Pellersels arrived at 1:47 p.m., took Ms. Winslow's vitals, and requested an ambulance for Ms. Winslow. (Ex. 6, Bates 24.) According to Nurse Pellersels' note, Ms. Winslow's oxygenation was at 88%, her heart rate was 125-132 beats per minute, her blood pressure was 98/52, and her respiration rate was 42 breaths per minute. (Ex. 7, Bates 64.) She also noted that Ms. Winslow appeared "sick looking" with "skin [that was] clammy, pale in appearance, speech slurred, and has an audible stridor." (Ex. 7,

Bates 64.). According to jail records, the ambulance was requested at 1:53 pm by Sgt. Frechette. (Ex. 6, Bates 21, 23.)

According to the ambulance records, an ambulance was requested at 1:54 pm, was at the scene at 1:59 p.m., and was at patient at 2:07 p.m. (Ex. 10, Bates 164.) The ambulance record states that Ms. Winslow "started to have difficulty breathing since yesterday." (Ex. 10, Bates 163.) Her respiratory rate was 42 beats per minute and her oxygenation was at 78%. (Ex. 10, Bates 163.) Ms. Winslow was then taken by ambulance to GICH emergency room and arrived there at 2:42 pm. (Ex. 10, Bates 164.)

Ms. Winslow was initially evaluated at GICH at 2:53 pm. (Ex. 2, Bates 139.) During the emergency room visit at GICH, Ms. Winslow was found to have infectious material in her lungs, abnormal blood clotting, and she was in septic shock. (Ex. 2, Bates 141-146.) She was airlifted to St. Mary's Essentia Hospital, a higher acuity facility. (Ex. 2, Bates 146.) At St. Mary's Essentia Hospital, Ms. Winslow was found to have acute respiratory failure and severe septic shock. (Ex. 11, p. 5, 13.) Despite extensive resuscitation efforts, Ms. Winslow died at 7:52 am on March 27, 2019. (Ex. 11, p. 13.)

An autopsy showed that Ms. Winslow died from infective endocarditis with bacterial infection and vegetation (growths) around the tricuspid valve, the heart valve that regulates blood flow from the heart to the lungs. (Ex. 12, Bates 175-181.) "Endocarditis is a known complication of intravenous drug abuse, as bacteria can be introduced into the blood stream by unsterile injection practices." (Ex. 12, Bates 175.) This infection spread into Ms. Winslow's lungs and led to respiratory distress and septic shock. (Ex. 12, Bates 175-181.)

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## STANDARD OF REVIEW FOR QUALIFIED IMMUNITY

Public officers are entitled to qualified immunity unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009). To overcome the defendants' qualified immunity claims, the plaintiff must show that: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional right; and, (2) the right was clearly established at the time of the deprivation. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010). This Court can exercise its sound discretion to determine which qualified immunity prong to address first. *Pearson*, 129 S. Ct. at 818. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal

quotations omitted); *see also Bernini v. City of St. Paul*, 665 F.3d 997, 1005 (8th Cir. 2012).

The second prong of the qualified immunity analysis is whether the officers' actions violated a clearly established statutory or constitutional right of which a reasonable person would have known. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Baribeau*, 596 F.3d at 478. "The fundamental question under this analysis is whether the state of the law, as it existed at the time of the arrest, gave the defendants 'fair warning' that the arrest was unconstitutional." *Baribeau*, 596 F.3d at 478 (quoting *Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007)). "For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Pelzer,* 536 U.S. at 739. "The Supreme Court . . . has made it clear that there need not be a case with 'materially' or 'fundamentally' similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution." *Selk*, 508 F.3d at 875 (quoting *Pelzer*, 536 U.S. at 736).

## ARGUMENT

**I.**   **COUNT I (INDIVIDUAL CAPACITY - DELIBERATE INDIFFERENCE) - GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT AGAINST DEFENDANTS PELLERSELS, KACHINSKE, THOMPSON, LATVALA, FRECHETTE, OLSON, AND NELSON.**

### A.    General Legal Standard for 8th Amendment Deliberate Indifference.

As a pretrial detainee, Ms. Winslow's right to medical care arises under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). However, the Eighth Circuit applies the Eighth Amendment deliberate indifference standard to cases involving pretrial detainees' right to medical care. *Id.*

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31 (1993). To prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs. *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it. *Id.; see also Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Estelle v. Gamble,* 429 U.S. 97, 105 (1976).

A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the

necessity for a doctor's attention." *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995). A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary. *Hartsfield v. Colburn,* 371 F.3d 454, 457 (8th Cir. 2004).

Deliberate indifference is equivalent to criminal-law recklessness, which is "more blameworthy than negligence," yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate. *See Farmer,* 511 U.S. at 835, 839-40. An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate. *Lenz v. Wade,* 490 F.3d 991, 995 (8th Cir. 2007). Deliberate indifference must be measured by the official's knowledge at the time in question, not by "hindsight's perfect vision." *Id.* at 993 n.1 (quoting *Jackson v. Everett,* 140 F.3d 1149, 1152 (8th Cir. 1998)). Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are questions of fact. *Coleman,* 114 F.3d at 785. "[T]he law [is] clearly established that a prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." *Meloy v. Bachmeier*, 302 F.3d 845, 847 (8th Cir. 2002).

### B. Ms. Winslow was Suffering an Objectively Serious Medical Need During the Period of March 24 Through the Morning of March 26.[3]

The U.S. Supreme Court has clearly held that the Eighth Amendment prohibits "unnecessary and wanton infliction of pain" and that denial of medical care which results

---

[3] The facts used to establish that Ms. Winslow was suffering an objectively serious medical need are based on the "Statement of General Facts" above as well as the individualized facts recited in Argument Section I.D. below.

in such pain violates the Eighth Amendment. *Estelle*, 429 U.S. at 103. The Court has also made clear that the protections of the Eighth Amendment and the inmates' right to medical care are not limited to cases involving extreme situations or life-threatening emergencies: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. . . . In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* Thus, even "less serious" medical conditions which result in unnecessary physical pain violate the Eighth Amendment. *Id.*

The Eighth Circuit defines a "serious medical need" as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos*, 73 F.3d at 176. A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary. *Hartsfield*, 371 F.3d at 457.

In the present case, Mr. Winslow's condition during the period of March 24 through the morning of March 26 was so severe and obvious that even a layperson would easily recognize that she was suffering a medical emergency requiring admission to the emergency department. The record shows that, starting on March 24, Ms. Winslow spent all of her time on the jail floor in debilitating pain. She was unable to get up to perform daily living tasks or use the bathroom. She was unable to walk, stand, pull herself up or do anything at all without assistance from jail staff.

On March 24, Sgt. Latvala, a lay person with no medical training, recognized that Ms. Winslow was experiencing a serious medical need that required an assessment by a

medical professional and he contacted NP Kachinske for assistance. On March 25, CO Olson, a lay person with no medical training, provided care for Ms. Winslow and saw that Ms. Winslow was completely incapable of taking care of herself and was in so much pain that she could not even pull herself into a wheelchair. In fact, the record shows that Ms. Winslow was experiencing so much pain that she could not even mobilize herself by crawling, and it took multiple correctional staff to move Ms. Winslow from one place to another and get her into a wheelchair.

On the early morning of March 26, correctional staff with no medical training once again realized that Ms. Winslow was suffering a serious medical illness. Both CO Olson and Sgt. Frechette testified that they felt Ms. Winslow needed medical attention when they started their shift at 6 am, and Sgt. Frechette requested for Nurse Pellersels to assess Ms. Winslow shortly after she started her shift. Prior to 8 am on March 26, Sgt. Frechette and CO Olson also noticed that Ms. Winslow was no longer rolling around the cell as she had been previously, that she was not moving around at all, that she was experiencing troubled/labored breathing, and that she stopped eating and drinking. Despite being gravely ill and debilitated on March 24 and 25, Ms. Winslow now displayed an objective change in her condition early morning on March 26 and was now exhibiting new concerning symptoms.

Any reasonable person with Ms. Winslow's symptoms during the period of March 24 through the morning of March 26 would know that they are experiencing a medical emergency requiring a proper medical assessment and diagnosis by a *physician* in a *hospital* setting. Ms. Winslow displayed a number of serious and *objective* symptoms,

including complete debilitation and inability to move, urinating on herself, being hot and stripping herself of all clothing even though her cell was maintained at normal temperature in March, inability to get off the jail floor, labored breathing, signs of dehydration, and eventual refusal of food and liquid. Any reasonable layperson would easily recognize the necessary for a doctor's attention given these symptoms; and, in this case, correctional staff with no medical training (Sgt. Frechette, Sgt. Latvala, and CO Olson) did, in fact, recognize that Ms. Winslow was in need of medical care. Accordingly, the evidence viewed in light most favorable to the Plaintiff sufficiently establishes that Ms. Winslow was experiencing an objectively serious medical need during the period of March 24 through the morning of March 26. "Had, say, a plumber or bus driver or dishwasher seen [Ms. Winslow's condition], that layperson would undoubtedly have told h[er]: 'You really need to see a doctor.'" *See, Trujillo v. Corizon Health, Inc.*, No. 17-cv-1633 (PJS/ECW), 2019 WL 1409331, at *3 (D. Minn. Mar. 28, 2019).      Plaintiff's burden at this stage of the proceedings is not to prove that Ms. Winslow was suffering an objectively serious medical need but to instead raise a genuine issue of material fact for trial. Based on the evidence set forth above, a reasonable jury can easily conclude that Ms. Winslow was suffering an objectively serious medical need during the period of March 24 through the morning of March 26. Therefore, Plaintiff has sufficiently established, for purposes of summary judgment, that Ms. Winslow was suffering an objectively serious medical need after she returned from the second ER visit.

C.  **Expert Evidence Establishing Individualized Liability Against Defendants Pellersels, Kachinske, Thompson, Latvala, Frechette, Olson, and Nelson.**

In support of her claims against Defendants, Plaintiff has produced the following expert reports and opinions:

1.  Suzanne L. Ward, RN, MS, LNC (Ex. 51; Ex. 52);

2.  Barbara J. McGuire, MD (Ex. 53);

3.  Jeffrey E. Keller, MD (Ex. 54);

4.  Jill Ferry, RN, MPAS, PA-C, (Ex. 55; Ex. 56).

Plaintiff will briefly summarize the reports below, but each report is being submitted in its entirety for the Court's full review and consideration. (Ex. 51-56.)

In her reports, Nurse Ward offer opinions pertaining to the conduct of Defendant Nurse Pellersels. (Ex. 51-52.) Nurse Ward opines that Nurse Pellersels committed numerous egregious breaches of the applicable standards of care, including, in part, failure to assess Ms. Winslow on March 25, failure to establish a medical care plan following Ms. Winslow's return from the ER, failure to properly monitor Ms. Winslow on March 25 and March 26, failure to follow directives of NP Kachinske, failure to assess or take Ms. Winslow's vitals during contact with Ms. Winslow around noon on March 26, and failure to recognize that Ms. Winslow was experiencing a medical emergency requiring return to the ER on March 25, the morning of March 26, and around noon on March 26. (Ex. 51, p. 5-9; Ex. 52, p. 2-6.) Nurse Ward opines that Nurse Pellersels' misconduct is so egregious that it surpasses mere negligence and instead constitutes

medical incompetence, failure to provide essential care, recklessness, and knowing and deliberate disregard for Ms. Winslow's health and safety. (Ex. 51, p. 5-9; Ex. 52, p. 2-6.)

Dr. McGuire is an internal medicine specialist with experience in correctional medical care. (Ex. 53, p. 1.) In her report, she provides an explanation of infections endocarditis, how this illness is typically contracted, and the course of infection and treatment methods. (Ex. 53, p. 9-17.) Dr. McGuire opines that NP Kachinske breached the applicable standards of care by failing to examine Ms. Winslow and deciding, without any medical assessment by anyone, that Ms. Winslow was able to control her bladder and did not require a return to the ER on March 24. (Ex. 53, p. 11, 14.) Dr. McGuire further opines that NP Kachinske breached the applicable standard of care by failing to determine whether Ms. Winslow was medically fit for jail and instead delegating this determination to correctional staff with no medical training. (Ex. 53, p. 14.)

Dr. McGuire also opines that both Nurse Pellersels and NP Kachinske breached the applicable standard of care by failing to properly assess Ms. Winslow's condition to establish a baseline that would allow them to recognize changes in her condition, and to create a care plan for monitoring her vital signs and condition. (ex. 53. P. 14.) Dr. McGuire determined that NP Kachinske's misconduct "amounts to deliberate neglect of [Ms. Winslow's] physical complaints and impairment." (Ex. 53, p. 11.) She further opined that NP Kachinske's failure to intervene and provide treatment for Ms. Winslow was a "callous disregard for Ms. Winslow's condition" as well as a "serious breach of medical standards of care and showed indifference to her suffering and need of care." (Ex. 53, p. 15.) "Through their utter incompetence and failures to act in accordance with

the applicable standards of care, jail caregivers and medical staff recklessly disregarded the obvious risk to Ms. Winslow's health and safety and allowed her to suffer in excruciating pain for days." (Ex. 53, p. 15.) "Jail caregivers and medical staff deprived Ms. Winslow of essential medical care that was necessary to save her life." (Ex. 53, p. 15.)

In addition to evaluating the quality of care provided, Dr. McGuire also provides opinions regarding the elements of damages and causation. (Ex. 53, p. 13, 15-16.) Specifically, Dr. McGuire opines that there was ample opportunity between March 24 and March 26 to save Ms. Winslow's life by returning her to the ER and to minimize her pain and suffering. (Ex. 53, p. 13, 15-16.) NP Kachinske could have easily saved Ms. Winslow's life and reduced her suffering had she performed or requested a proper assessment on March 24 when she was advised that Ms. Winslow had returned from the second ER visit. (Ex. 53, p. 13.) Dr. McGuire further opines that Ms. Winslow could have been successfully diagnosed and treated had she been returned to the ER even sometime prior to noon on March 26: "Even a 6 hour 'head start' on an evaluation and broad-spectrum antibiotic treatment for pneumonia would have likely halted the inexorable slide into overwhelming sepsis and multi-system organ failure." (Ex. 53, p. 13.) "More timely recognition of her vulnerable status and transfer to a higher level of care would have promoted hemodynamic stability and allowed for surgical intervention to remove the source of her Staph A. bacteremia." (Ex. 53, p. 13.)

Dr. McGuire opines that, had Ms. Winslow been returned to the ER before noon on March 26, she would have received medical care to manage her pain and discomfort,

her condition would have most likely been successfully treated, and she would have received essential medical care necessary to save her life. (Ex. 53, p. 16.) Dr. McGuire further opines that, had Ms. Winslow been returned to the ER before noon on March 26, "she was more likely to survive than die from her medical condition." (Ex. 53, p. 16.)

Dr. Keller is a medical doctor who specializes in correctional medicine. (Ex. 54, p. 1.) He opines that NP Kachinske breached the applicable standard of care by refusing to assess Ms. Winslow on March 24 when she was advised that Ms. Winslow had returned from the second visit to the ER. (Ex. 54, p. 8-9.) Dr. Keller opines that, without a medical assessment, NP Kachinske had a duty to return Ms. Winslow back to the ER on March 24. (Ex. 54, p. 5.) Dr. Keller further opines that NP Kachinske breached the applicable standard of care when she decided that Ms. Winslow was able to control her bladder and was choosing to urinate on herself without a medical assessment by anyone. (Ex. 54, p. 9.) Dr. Keller opines that NP Kachinske's failure to provide care for Ms. Winslow was both "incompetent . . . [and] astonishing." (Ex. 54, p. 9.) "NP Kachinske's negligence denied Ms. Winslow access to essential medical care and violated the medical standard of care." (Ex. 54, p. 9.)

Dr. Keller provides the following conclusions about the misconduct of NP Kachinske, Nurse Pellersels, and the jail correctional staff:

> NP Kachinske failed in her duties to Ms. Winslow and violated accepted medical standards of care by failing to even see Ms. Winslow after her return from her second visit to the emergency room in a 24-hour period, failing to review Ms. Winslow's records from that visit, failing to establish a plan of care for Ms. Winslow, and failing to heed the notifications of corrections staff that Ms. Winslow needed care. Instead, she flippantly asserted that Ms. Winslow was choosing to be incontinent of urine and she

even directed corrections staff to seek the advice of a non-medical corrections supervisor as to Ms. Winslow' fitness to remain in the jail. These actions and failures demonstrate reckless indifference for the wellbeing of Ms. Winslow, causing her to suffer from severe, unrelieved pain and causing her death from treatable bacterial endocarditis that led to septic shock. NP Kachinske recklessly and incompetently deprived Ms. Winslow of essential medical care that was necessary to save her life and subjected Ms. Winslow to a substantial risk of serious injury or death. NP Kachinske's actions demonstrate medical incompetence and disregard for Ms. Winslow's suffering and medical needs.

Nurse Pellersels also failed in her duties to Ms. Winslow and violated medical standards of care by failing to perform a nursing assessment of Ms. Winslow upon her return from the emergency room, failing to document her encounter with Ms. Winslow, and failing to recognize the seriousness of Ms. Winslow's symptoms and abnormal vital signs.  In fact, she wasted precious time with paperwork while Ms. Winslow's life was slipping away. Her failures to act and her indifference to Ms. Winslow's clearly deteriorating condition and medical needs caused Ms. Winslow to spend two days crying out in agonizing pain and allowed her condition to deteriorate to the point where she perished from septic shock from a treatable underlying condition. Nurse Pellersels' conduct was reckless towards Ms. Winslow's life and wellbeing and deprived Ms. Winslow of essential medical care that was necessary to save her life. Nurse Pellersels' actions surpass mere negligence and demonstrate incompetence and disregard for Ms. Winslow's suffering and medical needs.

Finally, corrections staff were well aware of Ms. Winslow's suffering as they documented it in their reports.  However, rather than insist that she receive the medical care she so clearly needed, jail staff acted as if it was perfectly natural to have to lift someone into a wheelchair who is too weak to walk to court, drag someone into their cell by their legs after they fall out of the wheelchair and can't get back in their cell on their own, and leave someone lying on the floor in their own urine for two days.  While some contacted medical staff to alert them of Ms. Winslow's symptoms, they stopped short of taking action that any layperson would recognize as necessary and requiring emergency medical response.  Some engaged in cruelty by mocking Ms. Winslow and outright refusing to help her.  As a result of their indifference to Ms. Winslow's condition, she suffered in pain, was unable to eat or drink, and was forced to lie in her own urine for two days only to die of a treatable medical condition.

(Ex. 54, p. 10-11.)

Jill Ferry is a Physician Assistant with over 33 years of clinical experience who is also an instructor and preceptor for Nurse Practitioners. (Ex. 55, p. 1.) PA Ferry offers the following expert opinions with respect to NP Kachinske's deficient medical care of Ms. Winslow and the suffering Ms. Winslow endured as a result:

> It is my professional opinion that Dianna Kachinske, NP failed to provide the standard of care to Ms. Winslow in the following ways:
>
> 1. Failed to perform an assessment and establish a care plan for Ms. Winslow after her return from the emergency room.
> 2. Failed to instruct on-scene medical personnel to assess Ms. Winslow and establish a care plan after her return from the emergency room. Consequently, no baseline was established, and no care plan was developed for Ms. Winslow that would have allowed corrections staff to recognize Ms. Winslow's worsening condition.
> 3. Failed to request more history on Ms. Winslow until two days after she returned from the Grand Ithaca Hospital emergency room.
> 4. Failed to assess Ms. Winslow's deteriorating condition when corrections staff reported her worsening symptoms with loss of bladder control.
> 5. Failed to recognize the severity of Ms. Winslow's condition with ongoing severe pain, loss of bladder function and inability to take herself to the bathroom which is a simple activity of daily living.
> 6. Failed to order Ms. Winslow be taken to the hospital for a further evaluation and more advanced care considering her worsening condition.
>
> . . .
>
> Had NP Kachinske arranged for more advanced care in a hospital setting when Ms. Winslow's condition worsened and the need became obvious, Ms. Winslow's pain would have been managed appropriately. Ms. Winslow would have received adequate nutrition and hydration and, most importantly, she would have received testing and medical care that would have allowed her underlying bacterial endocarditis to be diagnosed and treated. NP Kachinske's failure to return Ms. Winslow to the hospital for more advanced care caused Ms. Winslow's suffering and death.

(Ex. 55, p. 5-6.)

**D.      Plaintiff has Raised a Genuine Issue of Fact for Trial as to the Subjective Element of Deliberate Indifference Against Defendants Pellersels, Kachinske, Thompson, Latvala, Frechette, Olson, and Nelson.**

**1.      Legal Standard for Subjective Deliberate Indifference.**

A prison official exhibits deliberate indifference when the official actually knows and disregards a prisoner's serious medical needs." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995) (internal quotations marks omitted). In *Estelle v. Gamble*, the Court made clear that a deliberate indifference claim can be established by proving that a prison official "intentionally deni[ed] or delay[ed] access to medical care" or "intentionally interfering with the treatment once prescribed." 429 U.S. at 104-05. To establish a deliberate indifference claim, the plaintiff must show that the prison official knew of the serious medical condition yet deliberately disregarded it. *Coleman,* 114 F.3d at 784*; see also Farmer*, 511 U.S. at 837. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his [or her] knowledge of a substantial risk of serious harm." *Farmer,* 511 U.S. at 842. The factual determination that a prison official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence or from the very fact that the risk was obvious. *Id.*

In *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990), the Eighth Circuit held that "medical care so inappropriate as to evidence . . . refusal to provide essential care violates the eighth amendment." *Smith* also made clear that the mere fact that *some* medical treatment was offered to an inmate does not automatically result in a finding of no

deliberate indifference: "While it is true that courts hesitate to find an eighth amendment violation when a prison inmate has received medical care . . ., that hesitation does not mean . . . that the course of a [nurse's] treatment of a prison inmate's medical . . . problems can never manifest the [nurse's] deliberate indifference to the inmate's medical needs." *Id.* As the Seventh Circuit recently observed in *Petties v. Carter*,

> The difficulty is that except in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge. Rarely if ever will an official declare, "I knew this would probably harm you, and I did it anyway!" Most cases turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care. While evidence of medical malpractice often forms the basis of a deliberate indifference claim, the Supreme Court has determined that plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference. . . . But blatant disregard for medical standards could support a finding of mere medical malpractice, or it could rise to the level of deliberate indifference, depending on the circumstances.

836 F.3d 722, 728 (7th Cir. 2016). "The question of whether the official knew of the risk is subject to demonstration, like any other question of fact, by inference from circumstantial evidence." *Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998). "Therefore, if a plaintiff presents evidence of very obvious and blatant circumstances indicating that the defendant knew the risk existed, the jury may properly infer that the official *must* have known." *Id.* (internal quotations omitted, emphasis in original).

### 2.  Nurse Jeniffer Pellersels.

#### a.  March 25: Nurse Pellersels Knowingly Ignores Ms. Winslow for Her Entire Shift.

Nurse Pellersels worked a shift at Itasca County Jail on March 25, from 7:55 am to 4:18 pm, with a lunch break from 1:30 pm – 2:00 pm. (Ex. 102, p. 51-52.) Nurse

Pellersels failed to perform any medical assessment of Ms. Winslow at all at any time on March 25. (Ex. 102, p. 59.)

Per her testimony, Nurse Pellersels' first contact with Ms. Winslow occurred in the morning of March 25 when she administered medications to Ms. Winslow around 9:30 am. (Ex. 102, p. 60, 62-63; Ex. 7, Bates 55-56.) Prior to this encounter, Nurse Pellersels was informed by jail staff that Ms. Winslow had been seen twice at GICH emergency room for back pain and that she was prescribed medications. (Ex. 102, p. 63, 64.) Nurse Pellersels was also informed by jail staff prior to this initial encounter on the morning of March 25 that Ms. Winslow was "having mobility issues [and] [t]hat she has been incontinent." (Ex. 102, p. 63.) Nurse Pellersels testified that this information was relayed to her by jail staff around 7:55 a.m. when she initially came in to work. (Ex. 102, p. 64.) Nurse Pellersels admits that she did exactly nothing in response to this information. (Ex. 102, p. 64-65.) She does not recall reviewing Ms. Winslow's jail medical history, (Ex. 102, p. 65), and she did not take Ms. Winslow's vitals on the morning of March 25, (Ex. 102, p. 62).

Nurse Pellersels testified that she found Ms. Winslow on the mattress on the floor during the morning med pass on March 25. (Ex. 102, p. 67.) Nurse Pellersels claimed that she was able to perform "[n]ot a full nursing assessment" of Ms. Winslow during the morning med pass. (Ex. 102, p. 71.) This alleged nursing assessment revealed "a lot of things," namely that Ms. Winslow was alert, oriented, could communicate, and didn't appear pale or clammy. (Ex. 102, p. 71.) But further testimony reveals that this claimed "assessment" was no assessment at all:

Q.     Did she communicate any complaints to you during med pass on March 25th?

A.     I do not recall.

Q.     Did you ask her whether anything hurts?

A.     I do not recall.

Q.     Did you ask her to move around for you, so you can evaluate her mobility?

A.     No.

Q.     Did you ask her why she had been incontinent?

A.     No.

Q.     Is there any record of you performing any sort of formal or informal nursing assessment of Ms. Winslow on the morning of March 25th?

A.     No.

(Ex. 102, p. 72.) Nurse Pellersels admitted that she failed to take Ms. Winslow's vitals on the morning of March 25 because "that is not something that we normally do on med pass." (Ex. 102, p. 69.) She testified that she was fully able and capable of taking vitals at the time but she chose not to because "[i]t wasn't indicated." (Ex. 102, p. 70.) Even though she knew that Ms. Winslow had been to the ER twice in just several days, was incontinent, and was unable to get herself off the floor, she decided to ignore Ms. Winslow and leave her with no medical care because Nurse Pellersels "had no immediate concerns." (Ex. 102, p. 72.)

Nurse Pellersels testified that she had another contact with Ms. Winslow on March 25 when she assisted with getting Ms. Winslow into a wheelchair for court. (Ex. 102, p. 73.) Nurse Pellersels admits that she did not take Ms. Winslow's vitals during this encounter and that she did not perform a nursing assessment. (Ex. 102, p. 74-75.) Nurse Pellersels does not recall asking Ms. Winslow any questions during this encounter or taking any assessment of her pain. (Ex. 102, p. 75.)

Nurse Pellersels knew that March 25 was a Monday, that there had been no medical staff at the jail the entire weekend, that Ms. Winslow had been to the ER over the weekend, and that Ms. Winslow had not received a medical assessment since returning from the ER. (Ex. 102, p. 80-81.) Yet Nurse Pellersels did not take Ms. Winslow's vitals nor did she perform a nursing assessment at any time on March 25. (Ex. 102, p. 76.) In fact, Nurse Pellersels decided not to see Ms. Winslow at all for the remainder of her shift on March 25 after the med pass/wheelchair encounters and made no attempt to follow up with her that day. (Ex. 102, p. 76.) She testified that there was no need for any assessment or follow-up on March 25 because "[t]here wasn't any change in her status." (Ex. 102, p. 76-77.)

Nurse Pellersels failed to make any arrangements for any other medical provider to assess Ms. Winslow on March 25. (Ex. 102, p. 82.) She also failed to give any instructions to jail staff as to how to supervise/monitor Ms. Winslow or when to contact medical staff regarding her condition. (Ex. 102, p. 82.) She did not give instructions to jail staff to monitor Ms. Winslow for any specific symptoms or to call ACH on-call staff if any certain symptoms developed. (Ex. 102, p. 85.) Prior to leaving work at approximately 4:18 p.m. on March 25, Nurse Pellersels had a conversation with jail staff "regarding . . . her known incontinence." (Ex. 102, p. 83.) NP Kachinske confirmed that Nurse Pellersels never called her on March 25. (Ex. 103, p. 98.)

Nurse Pellersels did admit to reviewing Ms. Winslow's GICH emergency room discharge instructions (also known as "After Visit Instruction") at some point on March 25. (Ex. 102, p. 55-56, 164.) She specifically read the first page, (Ex. 9, Bates 91), stating

Ms. Winslow's end of visit vitals at the ER. (Ex. 102, p. 168.) She also read the diagnosis section of "Midline low back pain without sciatica" on the same page. (Ex. 102, p. 168-169.) She also read the "Reason for visit" section, listing the reason for visit as "back pain." (Ex. 102, p. 169.) She also read the "Instructions" section on the same page, (Ex. 9, Bates 91), indicating to "[g]et plenty of fluids and rest" and to "[r]eturn to the ED if you have worsening symptoms such as loss of bowel or bladder function . . . ." (Ex. 102, p. 170-171.) Nurse Pellersels never relayed these instructions to any jail staff on March 25 or March 26, 2019. (Ex. 102, p. 171.) In fact, she determined that it was "[n]ot necessarily [important]" for unlicensed jail staff with no medical training to have this information about a medically compromised inmate in their custody. (Ex. 102, p. 175.)

> Q.   What steps did you take to ensure that jail staff were aware of the information in the "Instructions" paragraph on page 91?
> …
> A.   None. I did not.

(Ex. 102, p. 175.)

Nurse Pellersels also read the "Call 911" section of the discharge instructions, (Ex. 9, Bates 95-96), on March 25, 2019, which directs to Call 911 if any of the following occur, "trouble breathing, confusion, very drowsy or trouble awakening, fainting or loss of consciousness, rapid or very slow heart rate, loss of bowel or bladder control." (Ex. 102, p. 175.) Like with the other discharge instructions, Nurse Pellersels did nothing to ensure that jail staff was familiar with or knew how to act on these discharge orders at any time on March 25 or March 26, 2019. (Ex. 102, p. 175-176.)

Nurse Pellersels also read the "When to seek medical advice" section of the discharge instructions, (Ex. 9, Bates 96), on March 25, 2019, which directs to "[c]all your healthcare provider any of the following occur, "pain becomes worse or spreads to your legs, weakness or numbness in one or both legs, numbness in the groin or genital area." (Ex. 102, p. 177-178.) She likewise did nothing to ensure that jail staff was familiar with or knew how to act on these discharge orders at any time on March 25 or March 26, 2019. (Ex. 102, p. 178.)

Surveillance video from March 25 exposes Nurse Pellersels' complete disregard for Ms. Winslow's health and safety on this date. Shortly after 9:00 am, Officers Olson and Sgt. Frechette are seen struggling to get Ms. Winslow into a wheelchair. (Ex. 100, 3-25-19 Echo Dayroom (1), 09:03-09:09.) At 09:04:48, Nurse Pellersels is seen arriving with a medication cart on the bottom right hand corner of the screen. (Ex. 100, 3-25-19 Echo Dayroom (1), 09:03-09:09, at 09:04:48.) Shortly after, Nurse Pellersels enters the dayroom where the officers are attempting to load Ms. Winslow into a wheelchair and another officer also arrives. (Ex. 100, 3-25-19 Echo Dayroom (1), 09:03-09:09, at 09:05:25.) Nurse Pellersels then holds the wheelchair as three officers struggle to load Ms. Winslow into the wheelchair. (Ex. 100, 3-25-19 Echo Dayroom (1), 09:03-09:09, at 09:05:25-09:07:25.) Ms. Winslow is clearly unable to provide any assistance at all to get herself into a wheelchair and its takes 3 officers several minutes to finally get her up and into a wheelchair. (Ex. 100, 3-25-19 Echo Dayroom (1), 09:03-09:09, at 09:05:25-09:07:25.) Once Ms. Winslow is in the wheelchair, Nurse Pellersels wheels her to the

table and just walks away. (Ex. 100, 3-25-19 Echo Dayroom (1), 09:03-09:09, at 09:07-09:08.)

Several minutes later, Nurse Pellersels returns to give Ms. Winslow her medications. (Ex. 100, 3-25-19 Echo Dayroom (1), 09:03-09:09, at 09:08:40.) 30 seconds later, Nurse Pellersels walks away again, leaving Ms. Winslow suffering the rest of the day with no medical assessment, no physical examination, no vitals check, and no check of any sort for the remainder of the day. (Ex. 100, 3-25-19 Echo Dayroom (1), 09:03-09:09, at 09:09:10.)

> **b.    March 26: Nurse Pellersels Abandons Ms. Winslow Until She's Nearly Dead.**

Nurse Pellersels worked a shift at Itasca County Jail on March 26, from 7:32 a.m. until 6:15 p.m., with a lunch break from 1:00 to 1:30 p.m. (Ex. 102, p. 51-52.) Nurse Pellersels never instructed jail staff to take Ms. Winslow's vitals, to watch her for specific symptoms, to report any specific observed symptoms back to her, or to generally monitor Ms. Winslow at any time on March 26. (Ex. 102, p. 154.)

On the morning of March 26, Sgt. Frechette requested for Nurse Pellersels to assess Ms. Winslow because "her back pain [wa]s increasing." (Ex. 102, p. 86-87.) Prior to this, Nurse Pellersels did not take any independent action to see or evaluate Ms. Winslow. (Ex. 102, p. 105.) Nurse Pellersels then went to see Ms. Winslow, at which time she took her vitals and did an assessment. (Ex. 102, p. 88.) Ms. Winslow told Nurse Pellersels that she hurt "all over," meaning that her entire body was in pain, and that she was not able to identify a specific area on her body where the pain was originating. (Ex.

102, p. 102-103.) Nurse Pellersels did not ask Ms. Winslow to rate her level of pain using any type of pain scale. (Ex. 102, p. 103-104.) Nurse Pellersels does not remember asking Ms. Winslow any questions during the assessment and no such questions are documented in Nurse Pellersels' chart (Ex. 7, Bates 64-65). (Ex. 102, p. 104.) According to the medical record, (Ex. 7, bates 64-65), Ms. Winslow's vital signs showed oxygenation of 92%, a heart rate of 112 beats per minute, blood pressure of 140/80, temperature of 97.5, and respiration of 22 breaths per minute. (Ex. 7, Bates 64.)

Nurse Pellersels claims Ms. Winslow "didn't look acutely sick." (Ex. 102, p. 106.) Yet Nurse Pellersels admits that Ms. Winslow was exhibiting signs of dehydration. (Ex. 102, p. 106.) Nurse Pellersels knew that Ms. Winslow had stopped drinking the night prior to this assessment. (Ex. 102, p. 107.) The record indicates no response by Nurse Pellersels to Ms. Winslow's dehydration. (Ex. 102, p. 106-107.) In fact, Nurse Pellersels readily admits that she did nothing to follow up on Ms. Winslow's dehydration, liquid consumption, or meal consumption for the entire day on March 26. (Ex. 102, p. 157-158.) Critically, Ms. Winslow's vitals showed a significant change at this point as compared to her ER discharge vitals from March 23: her blood pressure increased from 107/63 to 140/80, her heart rate increased from 105 to 112, and her respiratory rate increased room 20 to 22. (*Compare* Ex. 9, Bates 91 (ER discharge vitals), *with* Ex. 7, Bates 64 (vitals around 8:30 am on March 26).) Another critical point is that Ms. Winslow's pain had changed significantly as well from being localized to her back at the ER to spreading "all over" by the morning of March 26.

Nurse Pellersels had another morning encounter with Ms. Winslow on March 26 during the morning med pass. (Ex. 102, p. 128-129.) This is also documented in the jail medical record. (Ex. 7, Bates 56.) Nurse Pellersels does not recall asking Ms. Winslow any questions during this process. (Ex. 102, p. 129.) Nurse Pellersels did not conduct a nursing assessment of Ms. Winslow and she did not take her vitals at this time. (Ex. 102, p. 129.)

Nurse Pellersels claims that she called NP Kachinske as soon as she completed the morning assessment of Ms. Winslow: "I left the cell and called Dianna Kachinske." (Ex. 102, p. 110.) She called NP Kachinske "[b]ecause there was a change in Ms. Winslow's status" and Nurse Pellersels wanted to consult with Ms. Kachinske about how to proceed with providing care for Ms. Winslow. (Ex. 102, p. 116.) Nurse Pellersels told NP Kachinske what occurred over the weekend and what was reported to her. (Ex. 102, p. 111.) Nurse Pellersels relayed Ms. Winslow's vitals, told NP Kachinske Ms. Winslow's subjective complaints of lying on the floor in her cell on her left side since yesterday with no significant movement, being in the ER twice in the last week, and hurting all over. (Ex. 102, p. 111-112.) Nurse Pellersels also relayed her objective observations that Ms. Winslow was alert and oriented with pale skin, non-toxic in appearance, significant chapped lips, with clear lungs but tachycardic. (Ex. 102, p. 112.) Nurse Pellersels had Ms. Winslow's discharge instructions from GICH in paper as well as Ms. Winslow's jail medical record on the computer during the call with NP Kachinske. (Ex. 102, p. 114.) NP Kachinske testified she directed Nurse Pellersels "to do a nursing assessment and then get back to me." (Ex. 103, p. 93.)

Nurse Pellersels understood that NP Kachinske wanted to see Ms. Winslow's full medical records for the March 22 and March 23 GICH ER visits and that her task was to obtain those records as soon as possible and call NP Kachinske right away:

> Q.    What was your understanding of what you were to do when you got the records from the ER?
> A.    I get the medical records as soon as I can and then when I got those records on hand, give her a call.

(Ex. 102, p. 122-123.) Nurse Pellersels understood that her task also required Ms. Winslow to sign an authorization and for her to then contact GICH and request Ms. Winslow's medical records by fax. (Ex. 102, p. 124-125.) Nurse Pellersels was also aware that she could request medical records urgently by faxing the authorization and calling GICH to request urgent processing. (Ex. 102, p. 125-126.)

Nurse Pellersels testified that she took all of those steps above to urgently obtain Ms. Winslow's ER records. (Ex. 102, p. 126.) She claims that she went back to see Ms. Winslow "within a very short time frame" of her call with NP Kachinske "[b]ecause [she] wanted to get this completed as soon as possible." (Ex. 102, p. 126-127.) This encounter was done "[b]riefly[,] just long enough to explain what it is and have her sign [the release form]." (Ex. 102, p. 129.) Nurse Pellersels did not take Ms. Winslow's vitals during this time, nor did she conduct a nursing assessment. (Ex. 102, p. 130.) She claims that she did not observe any acute changes from her initial assessment earlier that morning. (Ex. 102, p. 130.) Nurse Pellersels did not conduct any nursing assessment of Ms. Winslow, nor did she take her vitals, at any time while waiting for the ER medical records to be faxed back from GICH. (Ex. 102, p. 135.) The release form signed by Ms. Winslow is missing from

the jail medical record (Ex. 7). (Ex. 102, p. 131.) As for the fax confirmation sheet documenting when the fax was sent, Nurse Pellersels shredded it on March 26 together with the authorization signed by Ms. Winslow and the fax cover sheet. (Ex. 102, p. 133, 138-139.)

These actions are not documented anywhere in the jail medical record (Ex. 7). (Ex. 102, p. 130-131.) Nurse Pellersels claims she then faxed the release to GICH and called GICH to request urgent processing, to which GICH staff responded "they 'would do their best.'" (Ex. 102, p. 136.) Nurse Pellersels' chart indicates, "ROI completed and sent to Grand Itasca Hospital where she was seen in the ER x2." (Ex. 7, Bates 64.) Again, due to lack of proper time documentation, it's impossible to tell from the medical chart when this action took place, but Nurse Pellersels claims it was "shortly after" Ms. Winslow signed the release because Nurse Pellersels was "still . . . attempting to get Ms. Kachinske Ms. Winslow's ER medical records as soon as possible." (Ex. 102, p. 137.) Eventually, GICH faxed back the ER medical records. (Ex. 102, p. 139.) Nurse Pellersels does not remember whether she called NP Kachinske or whether NP Kachinske called her first to inquire about the medical records. (Ex. 102, p. 138-139.)

Sgt. Frechette testified that, at 12:03 pm, Ms. Winslow refused lunch, stated she could not get up, and requested medical attention. (Ex. 106, p. 51-52.) Sgt. Frechette had a "gut feeling . . . there's something with her where she did seem actually in distress." (Ex. 106, p. 52.) Sgt. Frechette testified that he then located Nurse Pellersels and requested for her to assess Ms. Winslow. (Ex. 106, p. 52.) Sgt. Frechette testified that, according to his report, he told Nurse Pellersels that Ms. Winslow had refused lunch, was

unable to get up, and was requesting medical attention. (Ex. 106, p. 56-57; Ex. 6, Bates 22.) At this point, Nurse Pellersels went into Ms. Winslow's cell and had Ms. Winslow sign a release of information form. (Ex. 106, p. 53.) However, Nurse Pellersels did not check Ms. Winslow's vitals "or anything else . . . ." (Ex. 106, p. 52-53.) Sgt. Frechette – not Nurse Pellersels – ordered Ms. Winslow a liquid diet because she was not eating. (Ex. 106, p. 53.) After Nurse Pellersels left Ms. Winslow's cell, she provided no further instructions or comment to Sgt. Frechette pertaining to Ms. Winslow. (Ex. 106, p. 67.)

NP Kachinske testified that Nurse Pellersels never called her back and that NP Kachinske had to call the jail herself around noon to have jail staff locate Nurse Pellersels to follow up on the status of her request. (Ex. 103, p. 93-95.) NP Kachinske expected Nurse Pellersels to call her back much sooner and by noon decided that it was time to follow up herself. (Ex. 103, p. 95.)

Nurse Pellersels claims that she was on the phone with NP Kachinske going over Ms. Winslow's ER medical records when Sgt. Frechette requested her assistance with Ms. Winslow. (Ex. 102, p. 140-142.) At that point, Nurse Pellersels had no contact with Ms. Winslow since seeing her to sign the release form with no nursing assessments and no vital checks in-between. (Ex. 102, p. 142.) She testified that she at that point told NP Kachinske that she would call her back, grabbed her stethoscope and vitals machine, and went to Ms. Winslow's cell. (Ex. 102, p. 144.) Once at her cell, Nurse Pellersels visualized Ms. Winslow, noticed that her skin was clammy and she had slurred speech, took her vitals, and then requested an ambulance. (Ex. 102, p. 144-145.) According to her medical chart, (Ex. 7, Bates 64-65), Ms. Winslow's vitals were as follows: Ms.

Winslow's oxygenation was at 88%, her heart rate was 125-132 beats per minute, her blood pressure was 98/52, and her respiration rate was 42 breaths per minute. (Ex. 102, p. 145-146.)   She felt an ambulance was warranted at that time because Ms. Winslow's vitals had changed and Ms. Winslow had "decompensated" since she last saw her. (Ex. 102, p. 145-146.) After the ambulance left with Ms. Winslow, Nurse Pellersels claims she called NP Kachinske to update her on what had taken place. (Ex. 102, p. 152.)

Nurse Pellersels testified that she documented Ms. Winslow's vital signs using post-it notes both times she took vitals on March 26. (Ex. 102, p. 94, 146.) Nurse Pellersels generated her medical chart, (Ex. 7, Bates 64-65), after Ms. Winslow was taken away by ambulance on March 26. (Ex. 102, p. 155.) At this point, she claims that she transferred the vitals information from the post-it notes into the electronic medical record, (Ex. 7, Bates 64-65), which she signed at 2:35 pm on March 26. (Ex. 102, p. 155.) Nurse Pellersels claims that she ripped up the post-it notes and threw them away. (Ex. 102, p. 96, 147.)

Sgt. Frechette testified that Nurse Pellersels never provided him with any instructions or plan as to how to care for Ms. Winslow. (Ex. 106, p. 90.) Sgt. Frechette testified that Nurse Pellersels never instructed him on the "Call 911" section of Ms. Winslow's ER discharge instructions, (Ex. 9), and that he did not see the discharge instructions at any time while Ms. Winslow was at Itasca County Jail. (Ex. 106, p. 81-83.) Sgt. Frechette testified that, had he received any such instructions, he would have complied with them. (Ex. 106, p. 83.) Sgt. Frechette further admitted that he did, in fact, notice one of the symptoms from the "Call 911" section of the discharge instructions,

which was Ms. Winslow's trouble breathing. (Ex. 106, p. 84.) He testified that, on the morning of March 26, "it appeared that [Ms. Winslow] may be having a little trouble breathing." (Ex. 106, p. 42, 43.) He testified that he was concerned about Ms. Winslow's breathing pattern on the morning of March 26. (Ex. 106, p. 86.) But, given that Nurse Pellersels did not instruct him on Ms. Winslow's ER discharge instructions, he did not know that he was to call 911 after observing Ms. Winslow having trouble breathing. (Ex. 106, p. 86.)

CO Olson testified that Nurse Pellersels did not provide her with any instructions to watch for certain symptoms while monitoring Ms. Winslow or to report any certain symptoms to her. (Ex. 107, p. 40-41.) CO Olson testified that Nurse Pellersels never instructed her on the "Call 911" section of Ms. Winslow's ER discharge instructions, (Ex. 9), and that she did not see the discharge instructions at any time while Ms. Winslow was at Itasca County Jail. (Ex. 107, p. 42-43.) If Nurse Pellersels instructed CO Olson to specifically monitor Ms. Winslow for the symptoms listed in the "Call 911" section of the ER discharge instructions, (Ex. 9), CO Olson testified she would have done so. (Ex. 107, p. 43-44.) CO Olson testified that she would have paid closer attention to Ms. Winslow and looked out for specific symptoms had Nurse Pellersels instructed her to monitor Ms. Winslow for specific symptoms. (Ex. 107, p. 44.)

Sgt. Nelson testified that Nurse Pellersels did not provide her with any instructions to watch for certain symptoms while monitoring Ms. Winslow or to report any certain symptoms to her. (Ex. 108, p. 50-51.) Nurse Pellersels never informed Sgt. Nelson to call 911 if Ms. Winslow develops any certain medical symptom. (Ex. 108, p. 51.) Sgt. Nelson

testified that, had she been instructed by ACH staff to monitor Ms. Winslow for certain symptoms and to call 911 if a certain symptoms developed, she would have monitored Ms. Winslow more closely and would have called 911 if any such symptom developed. (Ex. 108, p. 52-53.)

Surveillance video from March 26 contradict Nurse Pellersels' deposition testimony and proves her abandonment of Ms. Winslow for the majority of the day. Nurse Pellersels' first contact with Ms. Winslow occurs at 8:34 am. (Ex. 100, 3-26-19 Echo West Cell, 08:34-08:40.) Nurse Pellersels arrives at 8:34 am and leaves at 8:40 am, spending approximately 6 minutes with Ms. Winslow. (Ex. 100, 3-26-19 Echo West Cell, 08:34-08:40.) Surveillance video from the dayroom does show Nurse Pellersels writing down Ms. Winslow's vital signs on the dayroom table. (Ex. 100, 3-26-19 Echo Dayroom (1), 08:34-08:41.) When does Nurse Pellersels return to have Ms. Winslow sign the release form for her GICH ER medical records? Almost three-and-half hours later at 12:05 pm! (Ex. 100, 3-26-19 Echo West Cell, 12:05-12:06.) Nurse Pellersels gets the form signed and leaves at 12:09 pm. (Ex. 100, 3-26-19 Echo West Cell, 12:08-12:09.) No vitals check or assessment is done during this time, but Ms. Winslow does appear to be asking for help from Nurse Pellersels after she signs the form. (Ex. 100, 3-26-19 Echo West Cell, 08:34-08:40, at 12:07-12:09.) Just like the day prior, Nurse Pellersels abandoned Ms. Winslow again and did not return until jail staff requested for her to come back **for the third time** to provide medical care for Ms. Winslow, at which point it was too late to save her life.

Several other points from the surveillance video are noteworthy. First, Nurse Pellersels did have another contact with Ms. Winslow at 9:05 am on March 26 to administer medications. (Ex. 100, 3-26-19 Echo West Cell, 09:06-09:09.) She spent about two-and-half minutes with Ms. Winslow, during which time Ms. Winslow again appears to be voicing some type of a complaint or request pertaining to her condition. (Ex. 100, 3-26-19 Echo West Cell, 09:06-09:09.) Nurse Pellersels did not document what was said during this encounter, but the video does appear to show Ms. Winslow requesting some type of assistance.

Second, the video shows that Ms. Winslow stayed in the exact same position and did not move at all for hours on March 26, but specifically between 8:30 and noon during the time Nurse Pellersels had contact with Ms. Winslow. (Ex. 100, 3-26-19 Echo West Cell, 08:00-12:30.)

Finally, it should be noted that the surveillance video from Nurse Pellersels' last contact with Ms. Winslow shortly before 2:00 pm **<u>does not</u>** show Nurse Pellersels writing down Ms. Winslow's vital signs as she did during the 8:35 am encounter when she last took Ms. Winslow's vitals (both the cell and the dayroom video do not depict Nurse Pellersels taking any notes). (Ex. 100, 3-26-19 Echo Dayroom (2), 13:47-14:00; Ex, 100, 3-26-19 Echo West Cell, 13:47-14:00.) Instead, Nurse Pellersels seems to be having a casual laugh with CO Olson as CO Olson throws up a thumbs-up while Ms. Winslow is dying on the jail floor:



(Ex. 100, 3-26-19 Echo Dayroom (2), 13:47-14:00, at 13:54:03.) If Nurse Pellersels did

not write down the second set of vitals she took, which the video shows she did not, then

where did the second documented set of vitals come from when she entered them into her

chart later that afternoon? Given Nurse Pellersels' numerous instances of neglect and

abandonment towards Ms. Winslow as well as Ms. Winslow's markedly changed

condition on the morning of March 26, a reasonable jury can conclude that Nurse

Pellersels fabricated the first set of vitals to make them appear not as extreme and that the

second set of vitals she took in the afternoon was actually collected at 8:35 am during

Nurse Pellersels' first encounter with Ms. Winslow.

### c.    Genuine Issues of Fact Preclude Summary Judgment.

In *Estelle v. Gamble*, the U.S. Supreme Court announced that "intentionally

denying or delaying access to medical care or intentionally interfering with treatment

once prescribed" constitutes deliberate indifference. 429 U.S. at 105; *see also Erickson v. Pardus*, 551 U.S. 89, 90 (2007). In this case, Nurse Pellersels, a trained and licensed medical professional, abandoned Ms. Winslow to die on the jail floor. Starting with their first encounter on March 25, Nurse Pellersels saw Ms. Winslow personally as three corrections officers struggled to load her into a wheelchair. Ms. Winslow was in so much pain that she could not move or assist getting herself off the floor in any way. Having witnessed Ms. Winslow's condition first-hand, how could any competent registered nurse do **nothing** in response? Nurse Pellersels had ample opportunity to assess Ms. Winslow, take her vitals, or at least check in with her to make sure she was comfortable. Instead, Nurse Pellersels completely abandoned Ms. Winslow and provided her no care whatsoever for the entire day on March 25.

Had it not been for the correctional officers' requests for assistance, Nurse Pellersels would have undoubtedly abandoned Ms. Winslow on March 26 just as she had the day prior. But even the officers' requests did not prompt Nurse Pellersels to save the life of a patient who was clearly dying before her very eyes. At 8:30 am, Nurse Pellersels was alerted that Ms. Winslow was having trouble breathing and required medical care. She saw Ms. Winslow and noted that she had not been drinking, was not moving, and was dehydrated. Per her chart, Nurse Pellersels completed a set of vitals which, given the totality of the circumstances and Plaintiff's expert evidence submitted herein, should have prompted Nurse Pellersels to return Ms. Winslow to the ER immediately. Instead, she claims she called NP Kachinske right away and then immediately got busy gathering the ER medical records. But, as proven by the surveillance video, Nurse Pellersels did

nothing for Ms. Winslow until about noon, and once again she acted only because Sgt. Frechette once again told her that Ms. Winslow was continuing to deteriorate and needed medical care. During the two shifts she worked on March 25 and 26, there was not a single time when Nurse Pellersels offered any help or medical care to Ms. Winslow on her own. Instead, Nurse Pellersels acted only when she was requested to check Ms. Winslow by the jail correctional staff who relied on her expertise as a licensed registered nurse.

At 12:05 pm, having abandoned Ms. Winslow for almost three-and-half hours, Nurse Pellersels returned to find Ms. Winslow in the same exact position on the jail floor. She did not assess Ms. Winslow or take her vitals but instead **finally** had Ms. Winslow sign the medical authorization for her ER medical records. If Nurse Pellersels spoke with NP Kachinske around 9 am, at which time NP Kachinske directed her to obtain Ms. Winslow's ER medical records, Nurse Pellersels ignored this directive for more than 3 hours! And then, after obtaining the authorization, Nurse Pellersels abandoned Ms. Winslow yet again and decided to take a lunch break. The GICH records state that they were printed at 12:46 pm on March 26 (Ex. 15), and they were presumably faxed over to Itasca County Jail around the same time. Nurse Pellersels gave so little regard for Ms. Winslow's health and wellbeing that she refused to complete even the simple task of ordering Ms. Winslow's records from GICH in a timely manner as she was directed by NP Kachinske.

As outlined above, Ms. Winslow seems to be complaining to Nurse Pellersels during the morning med pass at 9:05 am and again during their third encounter that day at

12:05 pm. Nurse Pellersels ignored Ms. Winslow's objectively dire condition; she ignored what appear to be direct requests for medical care from Ms. Winslow herself; she ignored requests for medical care from the jail correctional staff; she ignored the directives of NP Kachinske; she ignored Ms. Winslow's ER discharge instructions; and she ignored her training and duties to provide compassionate and ethical care for patients in need of emergency medical care. Instead, Nurse Pellersels took a lunch break during which Ms. Winslow's fight for her life slipped to the point of no return. Nurse Pellersels did exactly what *Estelle v. Gamble* prohibits – she knowingly ignored and delayed Ms. Winslow's serious need for emergency medical care until it was too late to save her life. Accordingly, genuine issues of material fact preclude summary judgment on Plaintiff's deliberate indifference claim against Nurse Pellersels.

### 3.    NP Dianna Kachinske.

#### a.    March 22-23: NP Kachinske Fails to Establish a Care Plan for Ms. Winslow Upon Her Return from the ER.

NP Kachinske was the on-call ACH provider for Itasca County Jail during the period of March 22-March 26, 2019. (Ex. 103, p. 35.) She lived 10 minutes away from Itasca County Jail and had the ability to report to the jail to visit a patient if needed. (Ex. 103, p. 51.)

NP Kachinske was first contacted about Ms. Winslow on March 22. (Ex. 103, p. 35.) She got one call that day from Itasca County Jail around 5:00 p.m. (Ex. 103, p. 38.) A correctional officer called her and reported that Ms. Winslow had arrived from the hospital emergency room and that she had low back pain and that she was prescribed

several medications. (Ex. 103, p. 38-40.) NP Kachinske gave verbal authorization to dispense those medications to Ms. Winslow. (Ex. 103, p. 38-40.) NP Kachinske "would have asked what her vital signs are . . . and her diagnosis." (Ex. 103, p. 41.) The officer relayed a set of vitals to NP Kachinske from her ER discharge papers that she found to be within normal range except her oxygen saturation was low. (Ex. 103, p. 42-43.) NP Kachinske did not direct any ACH medical staff to assess Ms. Winslow on March 22. (Ex. 103, p. 50.) Besides authorizing her prescribed medications, NP Kachinske did not develop any medical care plan for Ms. Winslow. (Ex. 103, p. 50.) NP Kachinske did not report to Itasca County Jail to assess Ms. Winslow on March 22. (Ex. 103, p. 51.)

NP Kachinske got two calls from Itasca County Jail pertaining to Ms. Winslow on March 23. (Ex. 103, p. 37, 51-53.) She missed the first call and by the time she called back, she was advised that Dr. Schamber had already been contacted and ordered Ms. Winslow to be transported to the ER. (Ex. 103, p. 52.) A corrections officer told NP Kachinske that Ms. Winslow was wetting herself and having too much pain sitting up. (Ex. 103, p. 52-53.)

She got another call from Itasca County Jail that day when a corrections officer called around 4:45 pm to report that Ms. Winslow had returned from the ER. (Ex. 103, p. 56, 60.) NP Kachinske testified that she would have asked the officer to review the After Visit Summary (ER discharge instructions, (Ex. 9)), including the diagnosis, prescribed medications, and vital signs. (Ex. 103, p. 60.) The officer told her that Ms. Winslow was diagnosed with low back pain without sciatica or exacerbation of chronic low back pain and that Ms. Winslow was prescribed the same medications. (Ex. 103, p. 61.) NP

Kachinske authorized for the prescribed medications to be dispensed. (Ex. 103, p. 61.) The officer reported the following vitals to NP Kachinske: blood pressure of "130 over something," "pulse . . . around 100," "[r]espirations were, like, 20" and oxygen saturation was 92%. (Ex. 103, p. 62.) NP Kachinske once again noted that Ms. Winslow's oxygen saturation was low. (Ex. 103, p. 62.) Besides authorizing the prescribed medications, NP Kachinske did not prescribe a medical care plan for Ms. Winslow. (Ex. 103, p. 64.) She also provided no instructions to jail staff as to how they should monitor Ms. Winslow. (Ex. 103, p. 64-65.) She also did not direct jail staff to watch for any certain symptoms and report or such symptoms to her. (Ex. 103, p. 66.)

NP Kachinske knew it was a Saturday and there was no medical coverage at Itasca County Jail and that there would be no medical coverage the following day on Sunday. (Ex. 103, p. 63-64.) NP Kachinske was in Itasca County when she got the call but she chose not to report to the jail to evaluate Ms. Winslow. (Ex. 103, p. 63-64.) When asked to explain why she failed to go to the jail to assess Ms. Winslow herself, NP Kachinske explained she was not paid enough to provide that basic level of medical care:

> Q.   And why didn't you go down to the jail to evaluate Ms. Winslow on
>        March 23rd?
> A.   Because that was not in my contract. I was paid to go there one hour
>        a week and then to take call[s], but not to be onsite at the jail.

(Ex. 103, p. 65-66.) NP Kachinske admittedly failed to follow up on Ms. Winslow's status at any point on March 23. (Ex. 103, p. 67.) Even though NP Kachinske had no intention of seeing Ms. Winslow herself, she also did not request to have the "Call 911" portion of the discharge instructions read to her, (Ex. 9, Bates 95-96), because they "are

usually computer-generated by the diagnosis . . . [a]nd I would use my own clinical judgment as far as whether or not they would need to be transferred to the hospital." (Ex. 103, p. 70.) Despite acknowledging that these discharge orders are helpful for people not trained in medicine, she did not order the officer who called her to read the "Call 911" portion of the discharge instructions to themselves. (Ex. 103, p. 71-72.)

    **b.**  **March 24: NP Kachinske Refuses to See Ms. Winslow as Her Condition Deteriorates and Instead Forces a Correctional Officer with No Medical Training to Complete a Required Nursing Assessment.**

  NP Kachinske received one call from Sgt. Latvala on March 24. (Ex. 103, p. 37, 72.) Sgt. Latvala reported that Ms. Winslow "was urinating on herself and that she couldn't get up to get - - and the reason why is she was having pain. And so . . . he asked me, 'So do you think that this is voluntary or involuntary?'" (Ex. 103, p. 73.) NP Kachinske claims that she then asked Sgt. Latvala a serious of questions:

> And then I asked him questions like, "Was she saying that she just -- you know, is she saying that she's" -- I mean, I clarified that it was the pain that was causing her from going to the bathroom. Then I asked if she was having any other problems, like with numbness, fevers. Let's see. I'm trying to think now what I asked. If she was -- yeah, basically that. If she was -- oh, yeah. And then -- I'm just trying to remember now. . . . And then . . . Let me think here. That was -- and so I said, "It sounds to me like that it's voluntary." And then I think he said, "Well, because the discharge instructions say she should go back if she has loss of bladder or bowel." And I said, "From what you're telling me, she does not have loss of -- but that she is voluntarily choosing not to get up to go to the bathroom due to her pain." And then I said, "Well, does she have any pallor or does she look" – you know, I just wanted to see if there was any changes with her. I said, "Well, has there been any other changes in her status, you know, and how she's doing?" And he said, "No." And then I specifically asked if she looked pale. And we discussed her vitals; like, so there was no fever. I said, "Was she sweaty? Is she short of breath? Is she having chest pain?" And then he said, "No." And then I said, "Well, I don't know what else to tell

> you because nothing really has changed with her." And then he said, "Well, do you think I should call the -- call Lucas Thompson?" And I said, "Well, if you feel more comfortable doing that, yes, go ahead and call him." And that was pretty much the discussion we had.

(Ex. 103, p. 73-74.) NP Kachinske also claims that she and Sgt. Latvala "reviewed her vital signs" and she asked him whether Ms. Winslow had any shortness of breath, chest pain, whether she was pale or if she looked . . . sweaty or offering any other symptoms at that time." (Ex. 103, p. 81.) NP Kachinske claims that Sgt. Latvala actually took Ms. Winslow's vitals and reported the results:

> Q.   What did he tell you with respect to her vitals?
> A.   I think her blood pressure was still -- hadn't changed. It was, like, 130 over maybe 70. Pulse was around 100. Respirations were, like, 20. O2 sat was 92 percent. Was still at 92 percent. And I think that prompted me to ask those other questions, like whether she was pale or short of breath.
> . . .
> Q.   What did he tell you with respect to her numbness?
> A.   That she wasn't having any numbness.

(Ex. 103, p. 81-82.) He also allegedly told her that Ms. Winslow was not exhibiting any labored breathing or chest pains and that she was not sweating or pale. (Ex. 103, p. 84-85.) NP Kachinske claims that Sgt. Latvala had all this information readily available and did not request any time to check on Ms. Winslow before answering any of her questions. (Ex. 103, p. 82-83.) Even though no record exists of this discussion ever having taken place, NP Kachinske claims she can recall these details now based solely on her memory. (Ex. 103, p. 84.)

At the conclusion if this consult with Sgt. Latvala, NP Kachinske did not formulate any sort of medical care plan for Ms. Winslow and did not provide any specific

instructions to Sgt. Latvala as to how jail staff should be caring for Ms. Winslow. (Ex. 103, p. 87.) NP Kachinske admitted in her testimony that she had Sgt. Latvala, a corrections officer with no medical training, perform a nursing assessment for her because no nurse was present on site and she wasn't paid enough to make a quick trip to the jail to assess Ms. Winslow herself:

> Q.      Would you agree, ma'am, that all these things that we just covered -- taking a patient's vital signs, checking them for numbness, chest pains, sweating, whether they're pale -- these are all things that would be included in a nursing assessment?
>
> A.      Yes.
>
> Q.      And were you aware of whether or not Sergeant Latvala was a nurse back in March of 2019?
>
> A.      No.
>
> Q.      Why didn't you order a nursing assessment for Ms. Winslow rather than having Sergeant Latvala report all these various symptoms back to you?
>
> A.      There was no nurse present.
>
> Q.      Did you have the ability to order Ms. Winslow to be taken to the hospital for a nursing assessment?
>
> A.      Yes.
>
> Q.      Did you have the ability to drive yourself to the jail to conduct a nursing assessment yourself?
>
> A.      Yes.
>
> Q.      And why did you choose to have Sergeant Latvala perform these tasks for you instead of driving to the jail and conducting your own nursing assessment?
>
> A.      That really wasn't in my contract to be there. I -- that -- I'm not at the -- I'm not at the jail. I'm only there one hour a week. I'm scheduled -- at a scheduled time.

(Ex. 103, p. 86-87.) NP Kachinske claims that Sgt. Latvala never asked her whether Ms. Winslow is fit for jail custody. (Ex. 103, p. 88.) She also testified that she did not suggest or direct Sgt. Latvala to call Jail Administrator Thompson. (Ex. 103, p. 88.)

Sgt. Latvala testified that he called NP Kachinske and specifically told her that he was concerned about the directive in the ER discharge instructions to return to the ER if Ms. Winslow is unable to control her bladder and that he needed to know whether Ms. Winslow should be returned to the ER. (Ex. 105, p. 30, 34.) "I told her, I just wanted to know if she thought she need to go back to the ER." (Ex. 105, p. 34.) The reason he called her, according to his testimony, was to have her determine whether Ms. Winslow was fit for jail custody. (Ex. 105, p. 38.) Sgt. Latvala testified that NP Kachinske told him that "Winslow is able to control her bladder, but is choosing to urinate on herself because she says she cannot get up." (Ex. 105, p. 27; Ex. 5, Bates 33.) Sgt. Latvala also testified that NP Kachinske "wanted [him] to call Captain Lucas Thompson to see if Winslow is fit for jail." (Ex. 105, p. 27; Ex. 5, Bates 33.) Sgt. Latvala testified that NP Kachinske never directed him to take Ms. Winslow's vitals, to examine her for numbness, to examine her for shortness of breath, to examine her for chest pain, to examine her for paleness, or to examine her for sweating. (Ex. 105, p. 29-30.) In fact, Sgt. Latvala testified that NP Kachinske did not ask him any questions at all. (Ex. 105, p. 31-32.) Per his testimony, NP Kachinske told Sgt. Latvala that Ms. Winslow did not need to go to the ER. (Ex. 105, p. 35.) Sgt. Latvala confirmed through testimony that NP Kachinske "wanted [him] to call Captain Lucas Thompson to see if Winslow is fit for jail," and he followed that directive and called Capt. Thompson. (Ex. 105, p. 36.)

### c.  March 25: No Action by NP Kachinske.

The record shows that NP Kachinske took no action with respect to Ms. Winslow on March 25. (See Ex. 6 and Ex. 7.) Nurse Pellersels testified that NP Kachinske did not

direct her to assess Ms. Winslow on March 25. (Ex. 102, p. 54.) NP Kachinske herself confirmed that she did nothing on March 25 to ensure that Ms. Winslow was receiving any medical care. (Ex. 103, p. 88.)

> **d.** **March 26: NP Kachinske Wastes Hours of Precious Time Waiting for Medical Records and Then High-Fives Nurse Pellersels for Their Joint Accomplishment of Abandoning Ms. Winslow to Die.**

NP Kachinske testified that she received one call from Itasca County Jail on March 26 pertaining to Ms. Winslow, and that the call was from Nurse Pellersels between 8:00 – 9:00 am. (Ex. 103, p. 37, 89.) According to NP Kachinske, Nurse Pellersels called "stating some concern about [Ms. Winslow's] condition, primarily that she'd been laying on the mattress, not being active over the last 24 hours." (Ex. 103, p. 89.) Nurse Pellersels reported to NP Kachinske all of the information from her medical chart (Ex. 7, Bates 64) pertaining to her first visit with Ms. Winslow, namely that Ms. Winslow had been laying on the floor in her cell since yesterday, that she had been laying on her left side with no significant movement, that she hurts all over but is vague about where she hurts, and that she had been to the ER twice in the last week. (Ex. 103, p. 106.) NP Kachinske also admits that Nurse Pellersels relayed the reported vital signs of 92% oxygenation, heart rate of 112, blood pressure of 140/80, temperature 97.5, and respirations 22. (Ex. 103, p. 106.) NP Kachinske also confirmed that Nurse Pellersels reported the objective symptoms of Ms. Winslow being alert and oriented, that her skin was pale, that she was non-toxic in appearance, that she had significant chapped lips, that she was tachycardic, and that her lungs were clear and equal bilaterally. (Ex. 103, p. 107.)

NP Kachinske instructed Nurse Pellersels to obtain Ms. Winslow's medical records from GICH ER for March 22 and 23 "to get a better picture of what was going on with her." (Ex. 103, p. 90, 91.) When asked why NP Kachinske failed to request the same records herself on Saturday or Sunday, she claimed she was not able to do so: "I didn't have the ability to do that. I didn't have the equipment." (Ex. 103, p. 92.) The phone call lasted "a couple of minutes" and NP Kachinske expected that Nurse Pellersels would comply with her directive "right away." (Ex. 103, p. 92.) NP Kachinske claims she directed Nurse Pellersels "to do a nursing assessment and then get back to me." (Ex. 103, p. 93.)

Nurse Pellersels testified that NP Kachinske knew independently, and prior to the call with Nurse Pellersels, that Ms. Winslow had been to the ER twice. (Ex. 102, p. 117.) Nurse Pellersels testified that NP Kachinske told her "that she had been notified over the weekend of her." (Ex. 102, p. 117.) Nurse Pellersels testified that NP Kachinske did not request Nurse Pellersels to read any of Ms. Winslow's available medical records to her, nor did she request any information from Ms. Winslow's GICH discharge instructions. (Ex. 102, p. 117.) Nurse Pellersels testified that NP Kachinske never requested a copy of Ms. Winslow's GICH discharge instructions. (Ex. 102, p. 119.) Nurse Pellersels testified that NP Kachinske did not direct Nurse Pellersels to conduct a nursing assessment of Ms. Winslow. (Ex. 102, p. 120-121.) Nurse Pellersels testified that NP Kachinske never directed her to assess Ms. Winslow, take her vitals, or monitor her in any way at any time on March 26. (Ex. 102, p. 12, 56, 152-153.)

NP Kachinske testified that Nurse Pellersels never called her back and that NP Kachinske had to call the jail herself around noon to have jail staff locate Nurse Pellersels to follow up on the status of her request. (Ex. 103, p. 93-95.) NP Kachinske expected Nurse Pellersels to call her back much sooner and by noon decided that it was time to follow up herself. (Ex. 103, p. 95.) At this time, NP Kachinske spoke with Nurse Pellersels and she told NP Kachinske that Ms. Winslow's "vitals had dropped significantly; and that she was calling the ambulance." (Ex. 103, p. 95.) NP Kachinske never confirmed whether Nurse Pellersels conducted a nursing assessment because "at that point the patient was . . . critical, and we did not go over that," nor did she ever confirm this fact afterwards. (Ex. 103, p. 97, 111.) NP Kachinske admits that Nurse Pellersels' chart, (Ex. 7, Bates 64), does not indicate that Nurse Pellersels conducted a nursing assessment as ordered. (Ex. 103, p. 97.) NP Kachinske also never asked Nurse Pellersels what happened from 8 am until noon. (Ex. 103, p. 99.) But, during their second phone call, NP Kachinske made sure to complement Nurse Pellersels on waiting until Ms. Winslow was almost dead to get her to the ER: she told Nurse Pellersels, "'Good job at calling the ambulance.' . . . 'It sounds like she really needs to be there now.'" (Ex. 103, p. 96.) NP Kachinske did not speak with Nurse Pellersels again on March 26. (Ex. 103, p. 96-97.)

### e.    Genuine Issues of Fact Preclude Summary Judgment.

Just like Nurse Pellersels, NP Kachinske knowingly disregarded Ms. Winslow's serious need for emergency medical care from March 24 through March 26. The record shows that NP Kachinske was first notified of Ms. Winslow on March 23, at which point

she became aware that Ms. Winslow had been to the ER twice in the last several days. Besides authorizing her to receive her medications prescribed at the ER, NP Kachinske did nothing on March 23 to establish any type of care plan for an incarcerated patient who was now seen at the ER twice in just matter of days. NP Kachinske did not prescribe any type of medical care plan for Ms. Winslow and made no arrangements for her to be evaluated by any medical staff after her return from the ER.

On March 24, NP Kachinske received a call from Sgt. Latvala who was reporting that Ms. Winslow was urinating on herself and he was concerned that her discharge instructions directed return to the ER in the event that she loses control of her bladder. Despite being just 10 minutes away from the jail, NP Kachinske refused to go to the jail to assess Ms. Winslow because she was not paid enough by ACH to complete a basic medical assessment for a patient in need of medical care. Instead, she claims that she had Sgt. Latvala take Ms. Winslow's vital signs and perform a nursing assessment on Ms. Winslow. To be sure, Sgt. Latvala denies being requested to complete any such vitals check or nursing assessment. Nonetheless, NP Kachinske's testimony establishes that she knew a nursing assessment was required at that time – otherwise, why would she testify that she requested Sgt. Latvala to perform it? Based on this alleged nursing assessment by Sgt. Latvala (that he claims never occurred) and without ever seeing or speaking with Ms. Winslow herself, NP Kachinske decided that Ms. Winslow was voluntarily choosing to urinate on herself and refused to order her to return to the ER. When Sgt. Latvala requested to know whether Ms. Winslow was medically fit for jail, NP Kachinske refused to answer and told him to call Capt. Thompson who has no medical training. She did

nothing else to follow up on Ms. Winslow's condition for the rest of the day on March 24. NP Kachinske never prescribed any type of medical care plan for Ms. Winslow, did not order routine vital checks to ensure she remained medically stable, and completely forgot about her for the entire day on March 25.

Then, around 8:30 am on March 26, NP Kachinske got a call from Nurse Pellersels indicating a change in Ms. Winslow's condition. NP Kachinske found out at this time that Ms. Winslow had stopped drinking, that she was dehydrated, that she was tachycardic, that her skin was pale, that she was no longer moving and was on the floor in the same position for hours, that her vitals were not within normal range, and that her vitals had changed from the time of ER discharge on March 23. At this point, three days after Ms. Winslow came back from the ER, NP Kachinske finally decides that it may be a good idea to review Ms. Winslow's medical records, a task that should have been completed three days prior on March 23. NP Kachinske then directs Nurse Pellersels to pull Ms. Winslow's ER medical records and forgets about Ms. Winslow for about 5 hours until approximately 1:30 pm.

Even though NP Kachinske testified that she called Nurse Pellersels back around noon to discuss the ER medical records, the evidentiary record in this case shows that those instructions were not even printed until 12:46 pm (Ex. 15; Ex. 102, p. 182 (discussing when the GICH medical records were received).) According to Nurse Pellersels, she was on the phone with NP Kachinske at approximately 1:45 pm discussing the ER medical records, which means that NP Kachinske took no action with regards to Ms. Winslow from approximately 8:30 am (when she initially ordered Nurse Pellersels to

pull the records) until approximately 1:45 pm (next time she spoke with Nurse Pellersels). This means that NP Kachinske forgot about Ms. Winslow for about 5 hours and did **nothing** to follow up on her status after she was advised that Ms. Winslow's condition had changed.

Instead of sending Ms. Winslow to the ER after speaking with Nurse Pellersels on the morning of March 26, NP Kachinske decided to finally review the ER medical records. She knew Ms. Winslow was deteriorating and this is why she ordered Nurse Pellersels to conduct a medical assessment. And when Nurse Pellersels disappeared for 5 hours and failed to follow up with NP Kachinske in a timely manner, NP Kachinske took no action and instead sat back and waited while Ms. Winslow continued to suffer on the jail floor until she reached the point of no return. What happened to the nursing assessment that NP Kachinske ordered and Nurse Pellersels never performed? What happened to the ER medical records that NP Kachinske claimed she needed to see urgently? Why didn't NP Kachinske order periodic vital checks for Ms. Winslow to ensure that she remained medically stable while NP Kachinske and Nurse Pellersels wasted precious time finally gathering Ms. Winslow's medical records? Why didn't NP Kachinske go to the jail herself to ensure that Ms. Winslow was medically stable while medical records were being gathered?

If NP Kachinske was providing competent care, the ER medical records should have been ordered and reviewed by March 24; a medical assessment with periodic vital checks should have been ordered on March 24; Ms. Winslow should have been sent back to the ER after the morning phone call with Nurse Pellersels; and, given the fact that Ms.

Winslow was left suffering in jail, a phone call to track down Nurse Pellersels should have been placed by 9:30 am on March 26 instead of 4 hours later at 1:45 pm. Whether NP Kachinske wasn't paid enough by ACH or was too busy or simply forgot, the record establishes that NP Kachinske knowingly ignored Ms. Winslow for days while she suffered and deteriorated on the jail floor. Thus, genuine issues of material fact preclude summary judgment on Plaintiff's deliberate indifference claim against NP Kachinske.

### 4.   Itasca County Jail Correctional Staff.

#### a.   Captain (Jail Administrator) Lucas Thompson.

Capt. Thompson was on call during the weekend of March 23-24, 2019. (Ex. 104, p. 16.) Sgt. Latvala called him on March 24 because "ACH had asked him to call me to find out if she was fit for custody." (Ex. 104, p. 16.) Capt. Thompson's response was, "She'd come back from the hospital, they found her fit for custody. You'd have to call ACH back and advise them. That's what I pay them for, is to determine if they're fit for custody." (Ex. 104, p. 117.) Capt. Thompson was surprised by ACH's request because he's not a medical professional and is not trained to determine whether inmates are medically fit for jail custody. (Ex. 104, p. 17.) He also expected and trusted that Sgt. Latvala would carry out his directive. (Ex. 104, p. 24.) Capt. Thompson never called back to follow up on Ms. Winslow's condition or to confirm whether ACH had determined whether Ms. Winslow was fit for jail custody. (Ex. 104, p. 25, 27.)

Sgt. Latvala testified that he called Capt. Thompson per directive from NP Kachinske and "asked him if she was fit for jail based off her ER discharge summary." (Ex. 105, p. 36.) According to Sgt. Latvala, Capt. Thompson replied, "[I]f the ER

released her and says she's fit for jail, then I guess she's fit for jail." (Ex. 105, p. 36.) Sgt. Latvala told Capt. Thompson that he had just spoken with NP Kachinske and that she wanted him to call Capt. Thompson to determine whether Ms. Winslow was fit for jail custody. (Ex. 105, p. 37.) Sgt. Latvala testified that Capt. Thompson never directed him to call NP Kachinske back and, as a result, he did not call her back for any further consultation. (Ex. 105, p. 37.)

Capt. Thompson knew that Ms. Winslow was urinating on herself since returning from the ER on March 23. (Ex. 104, p. 31.) Capt. Thompson knew that Ms. Winslow was living and sleeping on the jail floor for several days since returning from the ER on March 23. (Ex. 104, p. 31.) Capt. Thompson knew that Ms. Winslow was unable to get herself off the floor for several days since returning from the ER on March 23 due to severe pain. (Ex. 104, p. 32.) Itasca County Investigator A.J. Morse conducted an investigation into Ms. Winslow's death per Capt. Thompson's request. (Ex. 104, p. 36.) In his report, Investigator Morse states that Capt. Thompson contacted him on March 27 and requested an investigation. (Ex. 13, Bates 75.) Investigator Morse reports that Capt. Thompson "stated that Winslow had been complaining of back pain and would not get out of bed, and was incontinent to bladder." (Ex. 13, Bates 75.)

### b.    Sgt. Chad Latvala.

Sgt. Latvala worked at Itasca County Jail on March 22, 23, and 24 from 6:00 am to 6:00 pm. (Ex. 105, p. 9.) During his shift on March 23, Sgt. Latvala knew that Ms. Winslow had been to the ER the day prior (March 22) for back pain prior to getting booked into jail. (Ex. 105, p. 16.) On March 23, Sgt. Latvala was also aware that Ms.

Winslow was being sent out to the ER per Dr. Schamber's orders. (Ex. 105, p. 13-14.) Sgt. Latvala learned before the end of his shift on March 24 that Ms. Winslow had been screaming in pain. (Ex. 105, p. 40.) He also knew that she was unable to get up or walk. (Ex. 105, p. 41.)

On the morning of March 24, Sgt. Latvala obtained Ms. Winslow's discharge paperwork from the March 23 ER visit. (Ex. 105, p. 24.) At that point, he learned that Ms. Winslow had been ordered to return to the ER if she developed worsening symptoms such as loss of bowel or bladder function." (Ex. 105, p. 25, 44.) He also learned that Ms. Winslow was urinating on herself, at which point he called NP Kachinske to report this information to her and determine what to do. (Ex. 105, p. 25.) Per NP Kachinske's directive, Sgt. Latvala also called Capt. Thompson to have him determine whether Ms. Winslow was fit for jail custody. (Ex. 105, p. 36.)

Capt. Thompson claims that he told Sgt. Latvala to call ACH back and tell ACH to make that decision themselves. (Ex. 104, p. 18.) Specifically, he claims he instructed Sgt. Latvala to call NP Kachinske and direct her to make a determination whether Ms. Winslow was fit for jail custody. (Ex. 104, p. 20.) According to Capt. Thompson, sometime after Ms. Winslow died, he and Sgt. Latvala had a discussion about this issue and Sgt. Latvala told him that he failed to follow Capt. Thompson's directive and did not call NP Kachinske to request her to determine whether Ms. Winslow was fit for jail custody. (Ex. 104, p. 21-23.) Capt. Thompson was frustrated to find out that Sgt. Latvala failed to carry out his directive. (Ex. 104, p. 23.) Sgt. Latvala admits that he never called

NP Kachinske back for any further consultation after he spoke with Capt. Thompson. (Ex. 105, p. 37.)

### c.    Sgt. David Frechette.

Sgt. Frechette worked the day shift at Itasca County Jail on March 25, from 6:00 a.m. to 6:00 p.m. (Ex. 106, p. 10.) He also worked the day shift from 6:00 a.m. to 6:00 p.m. on March 26. (Ex. 106, p. 10.) At the start of his shift on March 25, Sgt. Frechette was advised that Ms. Winslow had been to the ER twice over the weekend. (Ex. 106, p. 21.)

Sgt. Frechette first saw Ms. Winslow on the morning of March 25, when he found her laying naked on the floor of her cell. (Ex. 106, p. 19.) Per his testimony, at around 11:45 a.m., he learned that Ms. Winslow was unable to get herself off the floor and into a wheelchair for court. (Ex. 106, p. 29-30.) Sgt. Frechette personally participated in getting Ms. Winslow off the floor and into a wheelchair. (Ex. 106, p. 30.) At approximately 3:41 pm, Sgt. Frechette learned that Ms. Winslow slid out of her wheelchair and was on the floor again. (Ex. 106, p. 32.) His last record for that day at 5:46 pm shows that [Ms.] Winslow [w]as still rolling around on the floor." (Ex. 106, p. 32-33.) At the end of his shift, Sgt. Frechette knew that Ms. Winslow had spent the entire day on the floor. (Ex. 106, p. 34.) He did not know at the end of his shift whether Ms. Winslow was seen by any medical staff and he made no efforts to have her seen by medical staff. (Ex. 106, p. 34-35.) He did not contact ACH to request medical care for Ms. Winslow, did not call her an ambulance, and did not instruct jail staff to take her to the ER. (Ex. 106, p. 36.) Even though Ms. Winslow had no signs of physical injuries yet could not get herself off the

floor for his entire 12-hour shift, Sgt. Frechette claims that he "did not observe anything that [he] felt would have been noticeable to either contact the nurse or the on-call provider." (Ex. 106, p. 37, 39.)

On March 26, Sgt. Frechette returned to work and found Ms. Winslow sleeping on the jail floor. (Ex. 106, p. 40.) At 6:50 am, he learned that Ms. Winslow had refused breakfast. (Ex. 106, p. 40.) At 8:43 am, Sgt. Frechette noticed that Ms. Winslow was exhibiting labored breathing. (Ex. 106, p. 41, 43.) He explained that "it appeared that she may be having a little trouble breathing." (Ex. 106, p. 42, 43.) This gave Sgt. Frechette "a bit of concern" and he contacted Nurse Pellersels "to check her vitals." (Ex. 106, p. 42.) He also decided to give Ms. Winslow another mattress: "I thought, Okay, you know what? I'll put another one here so . . . if you're trying to get to another spot or roll around, you at least have another mattress to roll onto." (Ex. 106, p. 42.) At this point, Sgt. Frechette had a "first gut instinct" that Ms. Winslow needed to be seen by a nurse. (Ex. 106, p. 43.) Sgt. Frechette then found Nurse Pellersels, told her that Ms. Winslow was exhibiting labored breathing, and asked her to assess Ms. Winslow. (Ex. 106, p. 44-45.) Nurse Pellersels took Ms. Winslow's vitals, but Sgt. Frechette has no record of what the vitals showed. (Ex. 106, p. 46.) Nurse Pellersels stated that Ms. Winslow's vitals were "fine" and "[n]othing extraordinary." (Ex. 106, p. 46, 47.) Sgt. Frechette and Nurse Pellersels then left Ms. Winslow on the jail floor. (Ex. 106, p. 50.)

Sgt. Frechette had contact with Ms. Winslow again at 12:03 pm, at which time Ms. Winslow refused lunch, stated she could not get up, and requested medical attention. (Ex. 106, p. 51-52.) Sgt. Frechette once again has a "gut feeling . . . there's something with her

where she did seem actually in distress." (Ex. 106, p. 52.) Sgt. Frechette responded by once again locating Nurse Pellersels and requesting her to assess Ms. Winslow. (Ex. 106, p. 52.) He told Nurse Pellersels that Ms. Winslow was requesting medical attention. (Ex. 106, p. 55.) Nurse Pellersels was also aware that Ms. Winslow had refused her lunch. (Ex. 106, p. 56.)  At this point, Nurse Pellersels went into Ms. Winslow's cell and had Ms. Winslow sign a release of information form. (Ex. 106, p. 53.) However, Nurse Pellersels did not check Ms. Winslow's vitals "or anything else . . . ." (Ex. 106, p. 52-53.) Sgt. Frechette ordered Ms. Winslow a liquid diet because she was not eating. (Ex. 106, p. 53.) Sgt. Frechette testified that, according to his report, he told Nurse Pellersels that Ms. Winslow had refused lunch, was unable to get up, and was requesting medical attention. (Ex. 106, p. 56-57; Ex. 6, Bates 22.) After Nurse Pellersels left Ms. Winslow's cell, she provided no further instructions or comment to Sgt. Frechette pertaining to Ms. Winslow. (Ex. 106, p. 67.)

### d.    CO Marnie Olson.

CO Olson worked two day shifts at Itasca County Jail on March 25 and March 26 2019, from 6:00 am to 6:00 pm.  (Ex. 107, p. 9, 12.) At the start of her shift on March 25, CO Olson learned that Ms. Winslow had been "to the ER twice and that she's just been laying around and she's been urinating [on herself] . . . [b]ecause she can't get up." (Ex. 107, p. 14.)

CO Olson's first contact with Ms. Winslow was early morning on March 25, at which time Ms. Winslow reported that "she couldn't move" due to back pain. (Ex. 107, p. 10.) At 6:50 am, Ms. Winslow refused breakfast. (Ex. 107, p. 32-33.) Later that morning,

CO Olson told Ms. Winslow to clean her cell, and Ms. Winslow stated "she couldn't do anything." (Ex. 107, p. 11.) At 7:13 am, CO Olson had contact with Ms. Winslow again. She logged that Ms. Winslow "rolls around on the floor and refuses any help to get her dressed. I cleaned her cell and helped her put a shirt on. I took out her sheets and blanket for they were full of urine. She wanted a wheelchair and I told her she needs to get dressed." (Ex. 5, Bates 32; Ex. 107, p. 35.) CO Olson noticed urine on Ms. Winslow's mattress and gave her clean clothes. (Ex. 107, p. 11.) CO Olson noticed that Ms. Winslow was naked, and Ms. Winslow explained that "she was hot and she peed in [her clothes]." (Ex. 107, p. 25.) CO Olson observed that "it wasn't hot in the cell." (Ex. 107, p. 26.) Based on these facts, CO Olson considered that Ms. Winslow may have been running a fever. (Ex. 107, p. 26.)

Later that morning, CO Olson told Sgt. Frechette, "When the nurse comes in, she's got to see her. She's complaining of back pain. . . . [T]his is not Danica." (Ex. 107, p. 11.) CO Olson knew Ms. Winslow from prior jail encounters in the past and she recognized that Ms. Winslow was not her usual self. (Ex. 107, p. 13-14.) "In the beginning I was kind of what I call tough love, just trying to feel her out: Come on, Danica. We've got to get up and get moving. Go to clean your cell. And like I said, my send time back in there I knew she was hurting." (Ex. 107, p. 19.) At 5:16 pm, CO Olson observed and logged that Ms. Winslow was "still rolling around on the floor." (Ex. 107, p. 33, 34; Ex. 5, Bates 31.)

When CO Olson came back to work at 6:00 am on March 26, she knew at that point that Ms. Winslow "had been laying on the floor in her cell for several days" and

that she had been to the ER twice in the last several days. (Ex. 107, p. 14.) CO Olson told Sgt. Frechette, "Once the nurse gets here, she should probably look at Danica again." (Ex. 107, p. 17.) CO Olson was concerned because Ms. Winslow still "couldn't move." (Ex. 107, p. 17.) At 11:28 am, CO Olson was again concerned that Ms. Winslow wasn't moving and told her "that she needs to move around to keep the blood circulation moving." (Ex. 107, p. 31.) CO Olson was concerned that Ms. Winslow "was not moving around as much as she was, more just staying in one spot." (Ex. 107, p. 32.) She testified that she passed this information on to Sgt. Frechette, and that he passed it on to the nurse. (Ex. 107, p. 32.) CO Olson admitted that on March 26 Ms. Winslow was moving less than she was moving on March 25. (Ex. 107, p. 32.) She also testified that Ms. Winslow was no longer "rolling around" the cell as she had been the previous day. (Ex. 107, p. 34, 36.)

### e.   Sgt. Erin Nelson.

Sgt. Nelson worked the night shifts (6:00 pm to 6:00 am the following day) at Itasca County Jail on March 22, March 24 and March 25. (Ex. 108, p. 9-10.) Her last possible contact with Ms. Winslow would've been at 6:00 am on March 26 (end of her shift and Ms. Winslow's last day at the jail). (Ex. 108, p. 11.)

Sgt. Nelson was working and assisted with getting Ms. Winslow booked into jail on March 22. (Ex. 108, p. 15.) She assisted with pat searching Ms. Winslow and then also did the strip search and watched her change into jail clothes. (Ex. 108, p. 15-16.) Sgt. Nelson does not remember Ms. Winslow experiencing any mobility issues during booking and knew that she was able to stand on her own and change into jail clothes. (Ex.

108, p. 15-19.) Sgt. Nelson knew that Ms. Winslow had just come from the ER and was complaining of having back pain. (Ex. 108, p. 20, 22.)

On March 24, at 5:27 am, Sgt. Nelson logged that Ms. Winslow "took off all clothing except her bra . . . [and] [w]as given water a couple times . . . as she claims she couldn't get up to get it herself." (Ex. 5, Bates 33; Ex. 108, p. 29, 46.) On March 25, at 4:56 am, Sgt. Nelson heard Ms. Winslow "yelling that it was too hot in her cell." (Ex. 108, p. 40; Ex. 5, Bates 32.) By the end of her shift at 6:00 am on March 26, Sgt. Nelson knew that Ms. Winslow was spending all of her time on the jail floor. (Ex. 108, p. 44.) She knew by the end of that last shift that Ms. Winslow had been to the ER twice in the last several days. (Ex. 108, p. 45.) Sgt. Nelson also knew that Ms. Winslow was experiencing ongoing back pain and that she was unable to move on March 25 and March 26. (Ex. 108, p. 45.) She also knew that Ms. Winslow was complaining of being hot, which she admitted is a symptom of having a fever. (Ex. 108, p. 43, 46.) Sgt. Nelson also knew that Ms. Winslow had been urinating on herself. (Ex. 108, p. 46.) Despite knowing all this, Sgt. Nelson never made any attempt to get Ms. Winslow any medical care. (Ex. 108, p. 46.)

> **f.   Genuine Issues of Fact Preclude Summary Judgment Against Defendants Thompson, Latvala, Frechette, Olson, and Nelson, and They are Not Entitled to Qualified Immunity.**

"Contracting out prison medical care does not relieve the [County] of its constitutional duty to provide adequate medical treatment to those in its custody." *Schaub v. VonWald*, 638 F.3d 905, 918 (8th Cir. 2011) (quoting *West v. Atkins*, 487 U.S. 42, 56

(1988)) (internal quotations removed). "Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006)) (internal quotations removed). But a jail "official may rely on a medical professional's opinion [only] if such reliance is reasonable."

The facts outlined above demonstrate that Defendants Thompson, Latvala, Frechette, Olson, and Nelson knowingly disregarded Ms. Winslow's serious need for emergency medical care and a substantial risk to her health and safety. The evidence shows that, during the period of March 24 through March 26, these Defendants watched Ms. Winslow suffer and deteriorate on the jail floor but none of them took any action to get Ms. Winslow to the ER where her condition could be assessed and treated by competent and qualified medical staff. True, some of the Defendants (such as Sgt. Latvala and Sgt. Frechette) contacted the incompetent ACH medical providers (Nurse Pellersels and NP Kachinske) who were in charge of Ms. Winslow's medical care at Itasca County Jail. Now they argue that they are entitled to qualified immunity because ACH medical staff were informed about Ms. Winslow's deteriorating condition and that the jail staff have a right to trust that medical staff was taking appropriate action. As outlined below, these arguments are without merit and genuine issues of fact preclude summary judgment and qualified immunity.

**Capt. Thompson:** Capt. Thompson was the jail administrator for Itasca County Jail in March of 2019. On March 24, he received a call from Sgt. Latvala who reported

that Ms. Winslow had been to the ER twice, that she had come back with discharge instruction stating that she was to return to the ER if she developed urinary incontinence, that Ms. Winslow was peeing herself at the jail, and that NP Kachinske was notified and directed for Capt. Thompson to determine whether she was fit for jail custody. Capt. Thompson was on call on March 24 and it was his duty to supervise and oversee the jail. Captain Thompson knew that Ms. Winslow was medically compromised and that she was exhibiting a specific symptom which warranted return to the ER per the GICH discharge instructions. Capt. Thompson also knew that it was the weekend with no medical staffing at the jail and he was frustrated by NP Kachinske's incompetence and inability to determine whether Ms. Winslow was fit for jail. Captain Thompson knew that he had a medically compromised inmate in his jail with no medical oversight (Ms. Winslow) combined with an incompetent medical provider who refused to do her job (NP Kachinske).

According to the testimony of Sgt. Latvala, Capt. Thompson made a medical judgment and declared, without speaking, seeing, or evaluating Ms. Winslow himself, that she was fit for jail custody just because she was discharged from the ER. Capt. Thompson did not call GICH to inquire whether Ms. Winslow was fit for custody; he did not call NP Kachinske to tell her to do her job; he made no effort to contact any other on-call ACH providers (such as Dr. Schamber who was presumably also available); he did not order jail staff to bring Ms. Winslow back to the ER; and, according to Sgt. Latvala, he failed to instruct Sgt. Latvala to contact NP Kachinske or other ACH staff again to force them to evaluate Ms. Winslow and determine whether she was fit for jail custody.

Capt. Thompson claims that he did, in fact, instruct Sgt. Latvala to call NP Kachinske back and tell her to do her job, but, as outlined above, this claim is directly disputed by Sgt. Latvala. The record viewed in light most favorable to the Plaintiff shows that he knew that Ms. Winslow was at risk of harm, that he refused to order her back to the ER, and that his only response was to order adult diapers to be delivered to Ms. Winslow at the jail. Given the disputed facts, a reasonable jury can conclude based on the evidence presented that Capt. Thompson knowingly disregarded Ms. Winslow's serious medical needs and ignored medical orders in her ER discharge instructions. Thus, Capt. Thompson is not entitled to summary judgment.

**Sgt. Latvala:** Sgt. Latvala called NP Kachinske on March 24 and then also followed up with Capt. Thompson after NP Kachinske refused to make a determination whether Ms. Winslow was fit for jail custody. But the reason Sgt. Latvala called NP Kachinske in the first place was because he had read Ms. Winslow's ER discharge orders which directed return to the ER if Ms. Winslow exhibited urinary incontinence and he also knew that Ms. Winslow was urinating on herself. Thus, he knew that Ms. Winslow was exhibiting a specific symptom for which she was ordered to return to the ER and he knew that NP Kachinske was refusing to send Ms. Winslow to the ER or even make a decision as to whether Ms. Winslow was fit for jail custody. According to Capt. Thompson, he directed Sgt. Latvala to call NP Kachinske back and direct her to do her job, which was to determine whether Ms. Winslow was fit for jail custody and whether she should go back to the ER.

Capt. Thompson also testified that he assumed Sgt. Latvala would carry out his directive and call NP Kachinske back as instructed. The record is undisputed that Sgt. Latvala never carried out this alleged order, never called NP Kachinske back, did not order Ms. Winslow back to the ER himself, and instead left Ms. Winslow at the jail despite the known ER discharge order for her to return to the ER if she exhibited urinary incontinence. The record is sufficient to prove that Sgt. Latvala refused to carry out the order of his superior which resulted in no one making a determination whether Ms. Winslow was fit for jail custody or needed to return to the ER. Thus, genuine issues of fact preclude summary judgment against Sgt. Latvala.

**Sgt. Frechette and CO Olson:** Sgt. Frechette was the jail custody supervisor on March 26, Ms. Winslow's last day at the jail. CO Olson also worked the morning shift on March 26. To his credit, Sgt. Frechette did notify Nurse Pellersels of Ms. Winslow's deteriorating condition several times on March 26. But Sgt. Frechette testified that he had a "gut feeling" that Ms. Winslow was experiencing some sort of a medical illness and that she was in need of medical care. He knew that entire morning that Ms. Winslow as not moving around, he knew that she had stopped eating and drinking, he knew that she had been to the ER twice in a matter of days, he knew that she was stuck on the jail floor and was unable to move or mobilize in any way, and he knew that she was explicitly requesting medical attention.

Officer Olson also testified that she knew that Ms. Winslow was experiencing some type of serious medical illness by the early morning of March 26. She interacted with Ms. Winslow on both March 25 and 26, and specifically noticed that Ms. Winslow's

condition changed remarkably by 6 am on March 26. She specifically testified that Ms. Winslow was able to roll around in her cell on March 25, but stopped moving completely on the morning of March 26. Like Sgt. Frechette, CO Olson knew that Ms. Winslow had been to the ER twice in the matter of days and that she was residing on the jail floor due to debilitating pain and inability to move. CO Olson dealt with Ms. Winslow on March 25 as well, at which time she had to drag her around and load her into a wheelchair with assistance of two other officers and Nurse Pellersels because Ms. Winslow was completely incapable of moving herself. By the morning of March 26, CO Olson knew that something was really wrong with Ms. Winslow and that she needed medical care.

Based on this evidence, a reasonable jury can conclude that Sgt. Frechette and CO Olson knew that Ms. Winslow was experiencing a medical emergency on the morning of March 26; that they knew that Nurse Pellersels was incompetent given her lack of appropriate response; that they knew that Ms. Winslow was in need of emergency medical care; and that they knew that Ms. Winslow was being deprived of access to emergency medical care by Nurse Pellersels. A reasonable jury can also find that Sgt. Frechette and CO Olson failed to order Ms. Winslow to the ER on March 25 and March 26 despite knowing that she was suffering a medical emergency and not receiving adequate medical care at the jail. Thus, Sgt. Frechette and CO Olson are not entitled to summary judgment.

**Sgt. Nelson:** Sgt. Nelson worked the night shift at Itasca County jail on March 22, March 24 and March 25. She saw and interacted with Ms. Winslow when she was booked into jail on March 22 and saw Ms. Winslow being able to stand, walk, and

mobilize herself without assistance during booking. By the end of her shift at 6:00 am on March 26, Sgt. Nelson knew that Ms. Winslow was spending all of her time on the jail floor and urinating on herself. Sgt. Nelson also knew that Ms. Winslow was experiencing excruciating back pain and that she was unable to move on March 25 and March 26 and was forced to reside on the jail floor. She also knew that Ms. Winslow was complaining of being hot even though it was not hot in the jail, which she admitted is a symptom of having a fever. Despite knowing all this, Sgt. Nelson never made any attempt to get Ms. Winslow any medical care or to get her to the ER. This evidence is sufficient to raise a genuine issue of fact for trial as to the subjective element of deliberate indifference against Sgt. Nelson.

**Jail Surveillance Video:** Finally, the Court should consider the general conditions of confinement Ms. Winslow was forced to endure for hours while residing on the jail floor during the last several days of her life. The images below are just a small sample taken from the surveillance video (Ex. 100) – each image displays the location, date, and time of the video from which the image is extracted.

March 25, 8:53 am, CO Olson watches as Ms. Winslow struggles to drag herself out of her cell:



March 25, 8:54-8:55 am, CO Olson laughs in amusement after dragging Ms. Winslow out of her cell into the dayroom:





March 25, 3:49 pm, Sgt. Frechette steps over Ms. Winslow while she's stuck in the middle of the dayroom floor after slipping out of the wheelchair earlier:



March 25, 5:07 pm, CO Olson drags Ms. Winslow back into her cell:



March 26 (last morning at the jail), 6:30 am to 12:30 pm, Ms. Winslow stuck in the same position on the floor of her cell the entire morning:





In sum, during the period of March 24 through the morning of March 26, Ms. Winslow was experiencing an obvious medical emergency. Ms. Winslow's condition was serious and any lay person could easily recognize that she was in need of emergency medical care in a hospital setting. Defendants Pellersels, Kachinske, Thompson, Latvala, Frechette, Olson, and Nelson disregarded Ms. Winslow's condition and refused to order her to the ER despite her rapidly worsening condition. These facts raise a genuine issue of material fact for trial against Defendants Pellersels, Kachinske, Thompson, Latvala, Frechette, Olson, and Nelson. Accordingly, these Defendants' motion for summary judgment as to Count I of Plaintiff's Complaint should be denied.

## II.   COUNT II (*MONELL* LIABILITY) - GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT AGAINST ACH FOR FAILURE TO TRAIN.

Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an "official municipal policy," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), (2) an unofficial "custom," *id.*; or (3) a deliberately indifferent failure to train or supervise, *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Policy and custom are not the same thing. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Alternatively, a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).

*Corwin v. City of Independence*, 829 F.3d 695, 699–700 (8th Cir. 2016).

"There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Moyle v. Anderson*, 571 F.3d 814, 817-18 (8th Cir. 2009) (quoting *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008). "There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach." *Id.* at 818; *see also Parrish v. Luckie,* 963 F.2d 201, 207 (8th Cir.1992) ("A public entity or supervisory official may be held liable under § 1983 even though no government individuals were personally liable.").

In the present case, Itasca County Jail actually had a formal policy in place dealing with continuity of medical care. (Ex. 15.) This policy was signed and adopted by both Itasca County and ACH. (Ex. 15.) This policy also has specific instructions for jail medical staff for procedure to follow when an inmate returns from the ER. (Ex. 15.) The policy(number is J-E-12 and J-E-13) is entitled "Continuity of Care During Incarceration & Discharge Planning" and provides, in relevant part, as follows: "When an inmate returns from the emergency room visit, the physician sees the patient, reviews the discharge orders, and issues follow-up orders as clinically indicated. If the physician is not on site, designated staff immediately reviews the hospital's discharge instructions and contacts the facility physician for orders as needed." (Ex. 15.)

Nurse Pellersels testified that she does not recall receiving any training on this policy from ACH or ever seeing this policy. (Ex. 102, p. 186-187.) NP Kachinske

likewise testified that she has never seen this policy or received any training on it from ACH. (Ex. 103, p. 114-115.) The facts outlined in Section I above demonstrate that Ms. Winslow did not receive appropriate continuity of care after her March 23 ER visit. When NP Kachinske received a call from Sgt. Latvala on March 24 to inform her that Ms. Winslow was back from the ER with specific discharge orders, she refused to see Ms. Winslow, failed to generate a care plan, and failed to direct Nurse Pellersels to examine and monitor Ms. Winslow the following day. In addition, NP Kachinske refused to make a determination whether Ms. Winslow was fit for jail custody and instead told Sgt. Latvala to call Capt. Thompson to make that determination. On March 25, Nurse Pellersels failed to assess Ms. Winslow, did not take her vitals even once, and provided her no medical care at all besides dispensing her prescribed medications. And, on March 26, Nurse Pellersels only checked on Ms. Winslow when requested by jail correctional staff.

Based on the facts presented, a reasonable jury can determine that Ms. Winslow could have been provided adequate medical care had Nurse Pellersels and NP Kachinske followed the County's policy on which they were never trained. For example, if the policy had been followed, NP Kachinske would be required to determine whether Ms. Winslow was fit for jail custody on March 24 and, since she was refusing to assess Ms. Winslow herself, she would be required to send Ms. Winslow back to the ER. In addition, a jury can find that, had this policy was followed, Ms. Winslow would be prescribed a care plan that would require at least a proper assessment with periodic vital checks to monitor her condition as well as instructions to jail staff to watch for symptoms identified

in the ER discharge instructions and to call 911 if such symptoms were observed. Finally, if this policy was followed, the ER medical records could have been ordered on March 24 and they would already be available for NP Kachinske to review when she decided to look at them on March 26. However, due to ACH's lack of training, Nurse Pellersels and NP Kachinske did not know this policy existed and failed to follow it. Following this policy could have easily resulted in Ms. Winslow being returned to the ER much sooner with enough time to save her life. Thus, ACH's failure to train Nurse Pellersels and NP Kachinske on this policy raises a genuine issue of fact for trial on Plaintiff's *Monell* claim against ACH.

## III.   PLAINTIFF'S WRONGFUL DEATH AND MEDICAL MALPRACTICE CLAIMS (COUNTS 3, 4, AND 6) SURVIVE SUMMARY JUDGMENT.

### A.   Itasca County Defendants.

The Itasca County Defendants seek to dismiss Plaintiff's wrongful death claim on the basis of official immunity. As explained below, Plaintiff's wrongful death claim survives based on the theory of federal constitutional violations. In addition, Capt. Thompson and Sgt. Latvala failed  to carry out ministerial duties and are not entitled to official immunity on Plaintiff's wrongful death claim based on the theory of negligence.

Plaintiff's wrongful death claim against the Itasca County Defendants is based on both state law (negligence) and federal constitutional violations: "Defendants caused Ms. Winslow's wrongful death through their deliberate indifference towards her serious medical needs (as alleged in Counts 1 and 2 above) and/or negligence (as alleged in the preceding paragraph)." (Doc. No. 39, p. 16, ¶70.) "Count[] 1 . . . above" as referenced in

Plaintiff's Complaint, is the deliberate indifference claim that is addressed in detail in this memorandum. Plaintiff seeks to establish that defendants caused Ms. Winslow's "wrongful death" by violating her constitutional rights, which then gives rise to the "wrongful death" claims under Minnesota state law. *See* Minn. Stat. § 573.02 ("When death is caused by the wrongful act or omission of any person or corporation, the trustee appointed . . . may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission."). Through Count 6, Plaintiff is also seeking to recover wrongful death damages pursuant to the recent statutory amendments which allow recovery for Ms. Winslow's pre-death pain and suffering. (Doc. No. 39, p. 19, ¶83-87.) Accordingly, Plaintiff's wrongful death claims against the Itasca County Defendants survive summary judgment based on the theory of federal constitutional violations.

In addition, as noted above, Plaintiff's wrongful death claims against the Itasca County Defendants is also based on the theories of negligence. In this particular case, Capt. Thompson and Sgt. Latvala are not entitled to official immunity (and Itasca County is not entitled to vicarious official immunity) because they failed to carry out ministerial duties, which strip them of official immunity. Furthermore, Defendants Thompson, Latvala, Frechette, Olson, and Nelson committed a willful or malicious wrong by failing to order Ms. Winslow back to the ER during the period of March 24 through March 26.

"The doctrine of official immunity provides that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong."

*State by Beaulieu v. City of Mounds View*, 518 NW 2d 567, 569 (Minn. 1994) (internal quotations omitted). "Official immunity is intended to protect public officials from the fear of personal liability that might deter independent action." *Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001) (internal quotations omitted). However, "[d]iscretionary conduct is clearly not protected if the official committed a willful or malicious wrong." *Elwood v. Rice County*, 423 N.W.2d 671, 679 (Minn. 1988); *Dokman*, 637 N.W.2d at 296 (official immunity does not shield a police officer from liability who commits a "willful or malicious wrong"). "The willful and malicious wrong standard contemplates whether the official has intentionally committed an act that he or she had reason to believe is prohibited." *Baribeau*, 596 F.3d at 482 (internal quotations omitted). "This is a subjective standard, in contrast to the objective qualified immunity standard." *Id.* (internal quotations omitted). "In the official immunity context, willful and malicious are synonymous." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991).

Determination of whether official immunity is available in a given context requires a two-step inquiry: (1) whether the alleged acts are discretionary or ministerial; and (2) whether the alleged acts, even though of the type covered by official immunity, were malicious or willful and therefore stripped of the immunity's protection. *Davis v. Hennepin County,* 559 N.W.2d 117, 122 (Minn. Ct. App. 1997). "A discretionary act is one for which an official must exercise 'judgment or discretion.'" *Dokman,* 637 N.W.2d at 296 (quoting *Johnson v. State,* 553 N.W.2d 40, 46 (Minn. 1996)). "A ministerial act involves merely the execution of a specific, absolute duty." *Id.* Official immunity does not apply when the duty at issue is ministerial; instead, only discretionary duties are

shielded by official immunity. *Davis v. Hennepin County*, 559 N.W.2d 117, 123 (Minn. Ct. App. 1997).

In the present case, Defendants Thompson and Latvala failed to perform ministerial acts. Capt. Thompson had a ministerial duty to supervise the jail and ensure that the jail inmates were medically fit for custody. When Capt. Thompson learned that ACH was refusing to decide whether Ms. Winslow was fit for custody, he did not have discretion to just ignore this issue and allow Ms. Winslow to continue to reside at the jail without a determination as to whether she is medically fit. Per his job description, Capt. Thompson was "[r]esponsible for security, safety, and control of all inmates . . . ," "[c]oordinat[ion] of emergency medical services for all inmates," and "[o]vers[ight] [and] implement[ation] [of] medical services for all inmates in the facility." (Ex. 16, Bates 238.) Plaintiff acknowledges that a decision whether an inmate is fit for custody has some degree of discretion. But a jail administrator does not have discretion to *refuse* to make a determination whether an inmate who is experiencing a medical emergency is fit for jail custody, which is precisely what Capt. Thompson did here. As for Sgt. Latvala, he intentionally refused to carry out a direct order by Capt. Thompson to call ACH and direct ACH staff to decide whether Ms. Winslow was fit for custody – once again failure to carry out a ministerial duty. Based on these facts, Itasca County, Capt. Thompson, and Sgt. Latvala are not entitled to official immunity because they failed to carry out ministerial tasks.

As stated above, official immunity also does not apply to discretionary duties if the official committed a "willful and malicious" wrong. "In the official immunity context,

willful and malicious are synonymous." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991). "This is a subjective standard . . . ." *Id.* (internal quotations omitted). In the present case, as argued in detail in Section I above, Defendants Thompson, Latvala, Frechette, Olson, and Nelson engaged in deliberate indifference, which requires knowing, reckless, and **<u>subjective</u>** disregard to a serious medical need. If there is a genuine issue of fact as to whether Defendants Thompson, Latvala, Frechette, Olson, and Nelson recklessly and subjectively deprived Ms. Winslow of access to emergency medical care, there is likewise an issue of fact as to whether these same Defendants committed a "willful and malicious" wrong under Minnesota state law. Thus, genuine issues of material fact preclude summary judgment against Itasca County and Defendants Thompson, Latvala, Frechette, Olson, and Nelson on Plaintiff's wrongful death claims.

### B.   ACH Defendants.

Minn. Stat. § 145.682, subd. 4(a), sets forth the expert affidavit requirements that must be satisfied by the Plaintiff in a medical malpractice lawsuit and provides, in relevant part, as follows: "The affidavit . . . must . . . state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion." In *Sorenson v. St. Paul Ramsey Med. Ctr.*, the Minnesota Supreme Court has explained that section 145.682 requires that the expert affidavit identify the applicable standard of care, identify the acts or omissions that allegedly violated that standard of care, and outline the chain of causation that resulted in the alleged damage. 457 N.W.2d 188, 193 (Minn.

2000). At the same time, the Minnesota Supreme Court has also emphasized that section 145.682 "does not require a disclosure's contents to be highly detailed." *Broehm v. Mayo Clinic Rochester*, 690 N.W.2d 721, 733 (Minn. 2005).

The ACH Defendants challenge Plaintiff's medical malpractice claim on the grounds that the original expert reports/affidavits (Ex. 51 and 53-55), do not provide sufficient specificity to prove medical malpractice under Minnesota state law. Plaintiff disagrees with these arguments and submits that the original expert affidavits/reports sufficiently state the facts necessary to establish the standard of care, breach, damages, and causation against Defendants ACH, Nurse Pellersels. and NP Kachinske. However, Plaintiff has now served two supplemental expert witness reports by Nurse Ward and PA Ferry, (Ex. 52 and 56), which spell out, with precision and specificity, the elements which the ACH Defendants are claiming to be lacking in the original expert reports. Plaintiff's expert reports combined, (Ex. 51-56), satisfy the requirements of section 145.682, and the ACH Defendants' motion to dismiss Plaintiff's medical malpractice claim should be denied.

**<u>CONCLUSION</u>**

As explained in detail above, Ms. Winslow suffered and ultimately died due to egregious constitutional violations, incompetent medical care, and reckless disregard for her health and safety. For all the foregoing reasons, Plaintiff respectfully requests that Defendants' motions for summary judgment be denied.


THE LAW OFFICE OF ZORISLAV R. LEYDERMAN


Dated: <u>May 28, 2024</u>             By: <u>s/ Zorislav R. Leyderman      </u>
                                         ZORISLAV R. LEYDERMAN
                                         Attorney License No. 0391286
                                         Attorney for Plaintiff
                                         The Law Office of Zorislav R. Leyderman
                                         80 South 8th Street, Suite 900
                                         Minneapolis, MN 55402
                                         Tel: (612) 876-6626
                                         Email: zrl@ZRLlaw.com