# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Debra Faye Pierce, *Trustee for the Heirs and Next of Kin of Danica G. Winslow*,

        Plaintiff,

v.

Itasca County; Advanced Correctional Healthcare, Inc.; Lucas Thompson, *Corrections Captain*; Shawn Racine, *Corrections Lieutenant*; David Freschette, *Corrections Sergeant*; David Hill, *Corrections Officer*; Sammy Imbleau, *Corrections Officer*; Chad Latvala, *Corrections Officer*; Chris Kebart, *Corrections Officer*; John Linder, *Corrections Officer;* Erin Nelson, *Corrections Officer;* Marnie Olson, *Corrections Officer*; Amy Slettom, *Corrections Officer*; C. Ploetz, *Corrections Officer;* D. Roberts, *Corrections Officer*; D. Ross, *Corrections Officer*; ER, *Corrections Officer*; SR, *Corrections Officer*, all in their individual and official capacities and as agents/employees of Itasca County*; Dianna Mae Kachinske, *CNP*; Jeniffer Pellersels, *RN*;

        Defendants.

Case No. 22-CV-00441 (JMB/LIB)

**ORDER**

---

Zorislav R. Leyderman, The Law Office of Zorislav R. Leyderman, Minneapolis, MN, for Plaintiff Debra Faye Pierce.

John B. Casserly and Charles Gross, Geraghty, O Loughlin & Kenney, St. Paul, MN, for Defendants Advanced Correctional Healthcare, Inc.; Dianna Mae Kachinske; and Jeniffer Pellersels.

Jason M. Hiveley, Iverson Reuvers Condon, Bloomington, MN, for Defendants Itasca County, Lucas Thompson, Shawn Racine, David Freschette, David Hill, Sammy Imbleau, Chad Latvala, Chris Kebart, John Linder, Erin Nelson, Marnie Olson, Amy Slettom, C. Ploetz, D. Roberts, D. Ross, E.R., and S.R.

---

This matter is before the Court on Defendants Itasca County's, Captain Lucas Thompson's, Lieutenant Shawn Racine's, Sergeant David Frechette's,[1] Officer David Hill's, Officer Sammy Imbleau's, Officer Chad Latvala's, Officer Chris Kebart's, Officer John Linder's, Officer Erin Nelson's, Officer Marnie Olson's, Officer Amy Slettom's, Officer C. Ploetz's, Officer D. Roberts's, Officer D. Ross's, Officer E.R.'s, and Officer S.R.'s (together, "the Itasca County Defendants") motion for summary judgment. (Doc. No. 78.) In this action, Plaintiff Debra Faye Pierce alleges Section 1983 and wrongful death claims against the Itasca County Defendants for their treatment toward Decedent Danica G. Winslow. For the reasons explained below, the Court grants the motion in part and denies it in part.

## BACKGROUND AND STATEMENT OF UNDISPUTED FACTS

Winslow was held in custody at the Itasca County Jail (Jail) from March 22 to March 26, 2019. (Doc. No. 39 ¶¶ 17, 54.) Pierce is Winslow's mother, and the trustee of Winslow's estate. (*Id.* ¶ 7.) Itasca County is a municipal corporation and public employer of the sixteen individually named defendants. (*Id.* ¶ 8.) Advanced Correctional Healthcare, Inc. (ACH)[2] provides medical services for inmates at the Jail. (*Id.* ¶ 9.) While in custody,

---

[1] While the docket incorrectly lists this defendant's last name as "Freschette," given how he was named in the amended complaint (Doc. No. 39), the Court refers to him throughout this order as "Frechette," consistent with its spelling in his deposition. (Doc. No. 88-28.)

[2] ACH and three of its agents or employees—Travis Schamber, Dianna Mae Kachinske, and Jeniffer Pellersels—(together, "the ACH Defendants") filed a separate motion for summary judgment. (Doc. No. 68.) Schamber has since been dismissed (Doc. No. 102), and Plaintiff's Counsel informed the Court that additional stipulations for dismissal were forthcoming for the other ACH defendants. Therefore, the Court need not address their motion for summary judgment.

Winslow exhibited symptoms of medical distress and was taken to the emergency room multiple times.  The parties do not dispute the following chronology of events.

### A.    Friday, March 22—Winslow's Arrest and Emergency Room Visit

On the morning of Friday, March 22, 2019, an ambulance was dispatched to a residence in Calumet, Minnesota, because Winslow had "thr[own] her back out and was in need of assistance."  (Doc. No. 81-1 at 5, 7.)  At that time, Winslow had outstanding warrants, and law enforcement officers were also dispatched to the residence.  (Doc. No. 88-3.)  Upon arriving at the residence, first responders found Winslow lying on the floor, crying, and moaning in pain.  (Doc. No. 81-1 at 7.)  Winslow was experiencing severe back pain, which she ranked "10/10," and reported that she had "been unable to really move at all without pain."  (*Id.*)  First responders used equipment to lift Winslow onto a stretcher because she was unable to lift herself up from the floor and then transported her by ambulance to Grand Itasca Clinic and Hospital (GICH).  (*Id.*)  En route to the GICH, Winslow admitted to having a past substance abuse disorder but claimed to have been clean for approximately one week.  (*Id.*)  She also stated that she had taken non-prescription Methadone for her pain.  (*Id.*)

Upon arriving at GICH, Winslow was treated by a medical doctor in the emergency room.  (Doc. No. 81-2; Doc. No. 88-2.)  Winslow was experiencing back pain, difficulty moving, and possible substance withdrawal.  (Doc. No. 88-2 at 1, 3.)  Winslow's vitals were stable; however, her blood pressure was on the lower side, and her pulse was slightly faster than normal.  (*Id.* at 3.)  She had no fever or loss of bowel or bladder function.  (*Id.* at 1, 3.)  Winslow received blood tests, had x-rays, and was given medication for her pain

as well as fluids to treat dehydration.  (*Id.* at 3, 7.)  Winslow responded well to this treatment, and eventually was able to walk to the bathroom on her own.  (*Id.* at 7.)  She was discharged from GICH with final diagnoses of "acute exacerbation of chronic low back pain" and "polysubstance abuse."  (*Id.*)  She was prescribed pain medication and instructed to follow up if her symptoms worsened or did not improve.  (*Id.*)

After GICH discharged Winslow, she was arrested and brought to the Jail.  (Doc. No. 88-3 at 1.)  Jail video shows that when Winslow arrived, and during booking, she was standing and moving on her own.  (Doc. No. 89 at 3-22-19, Bottom Stairs, 18:57–18:58; *id.* at 3-22-19, Booking, 22:29–23:16.)  During Winslow's medical screening, she noted a medical condition with her back.  (Doc. No. 81-3 at 18.)  Officer Nelson learned that Winslow was complaining of back pain and assigned Winslow to a jail cell with a higher bunk to accommodate her pain.  (Doc. No. 81-4 at 12:14–21.)  That evening, a corrections officer called ACH and spoke with Nurse Practitioner Kachinske.[3]  (Doc. No. 81-5 at 38:13–23.)  The officer informed Kachinske that Winslow had arrived with low back pain and had been prescribed pain medications.  (Doc. No. 81-5 at 38:13–23.)  Kachinske authorized the Jail to administer the medications.  (*Id.* at 38:23–25.)

### B.    Saturday, March 23—Winslow's Second Emergency Room Visit

The next morning, Officer Slettom learned that Winslow had been treated in the emergency room for back pain the previous night.  (Doc. No. 88-6 at 9.)  Throughout the morning, Slettom observed Winslow lying on the floor in pain.  (*Id.*)  Winslow had

---

[3] ACH offered 24/7 on-call services to the Jail as well as an on-site nurse on weekdays from 8:00 a.m. to 5:00 p.m.  (Doc. No. 88-25 at 28:13–28:14, 28:22–29:1, 30:1–30:6.)

removed her clothing after urinating on herself and claimed that she was unable to get up to use the bathroom.  (Doc. No. 88-5 at 4.)  Slettom offered to help Winslow get up, but Winslow declined due to her pain.  (*Id.*)  Slettom told Winslow that the hospital "would not have cleared her [for jail] if she could not be [t]here."  (*Id.*)

At approximately 11:45 a.m., Slettom gave Winslow clean clothes and took her vitals.  (Doc. No. 88-6 at 9.)  Slettom reported Winslow's vitals to Dr. Travis Schamber, an on-call provider with ACH, as follows: pain level ("9/10"), blood pressure ("74/49" and "79/50"), temperature ("97.8"), pulse ("113"), and oxygen level ("91%").  (Doc. No. 88-7 at 3.)  Per Schamber's orders, Winslow was transported back to the GICH emergency room via ambulance.  (*Id.*; Doc. No. 88-6 at 9; Doc. No. 88-8.)  Slettom informed Sergeant Latvala of this incident.  (Doc. No. 88-6 at 11.)

Upon arriving at GICH, at around 1:05 p.m., Winslow was treated in the emergency room by a physician assistant.  (Doc. No. 88-8 at 3; Doc. No. 88-2 at 8.)  Winslow reported continued back pain but no bowel or bladder dysfunction.  (Doc. No. 88-2 at 8.)  The physician assistant reviewed the x-rays and lab work from Winslow's visit the previous day and performed a physical examination.  (*Id.* at 9–10, 11.)  The physician assistant concluded that Winslow was suffering from bilateral lower back pain, consistent with back muscle strain.  (*Id.* at 11.)  Winslow was given a pain patch and other pain medication and was discharged with instructions to follow up if she experienced "new concerning symptoms."  (*Id.*)  Discharge instructions from this visit also directed Winslow to call emergency services if any of the following occurred: "trouble breathing, confusion, very

drowsy or trouble awakening, fainting or loss of consciousness, rapid or very slow heart rate, or loss of bowel or bladder control." (Doc. No. 88-9 at 4–5.)

Winslow returned to the Jail at 4:44 p.m. (Doc. No. 88-5 at 3.) This time, Winslow was returned to her cell in a wheelchair, lifted into bed, and given an extra mattress and two blankets. (*Id.*) Slettom notified Kachinske of Winslow's return, and Kachinske approved Winslow's use of the pain patch until the following day, as well as the same medications that had previously been prescribed. (*Id.*; Doc. No. 81-5 at 61:15–25.)

### C. Sunday, March 24—Denial of Winslow's Request to Return to the Emergency Room for Additional Medical Treatment

The following morning, Nelson reported that Winslow had, once again, removed her clothing and claimed she was unable to get up on her own. (Doc. No. 88-5 at 3.) Slettom also noted that Winslow had urinated on herself and had not left her bed since returning from the emergency room the prior afternoon. (*Id.*) Throughout the morning, Slettom and Latvala checked on Winslow. (*Id.*) Winslow was "demanding to go back to the [emergency room]," "screaming in pain, refusing to attempt to get up," "[s]a[ying] she can't move . . . [and] will continue to lay and urinate herself," and "banging on the wall again." (*Id.*) Winslow was given water, ice packs, and her medication. (*Id.*)

At approximately 9:12 a.m., Latvala called Kachinske to ask whether Winslow needed to return to the emergency room because Winslow's discharge papers indicated that she should return if she has loss of bladder function. (*Id.*; Doc. No. 81-5 at 76:23–77:14; Doc. No. 88-9 at 1; Doc. No. 81-10 at 38:10–38:23.) Latvala informed Kachinske that Winslow stated she could not get up to go to the bathroom. (Doc. No. 88-5 at 3; Doc. No.

81-5 at 74:2–74:5, 77:9–77:14.)  Kachinske told Latvala that she believed Winslow was voluntarily urinating on herself because she was choosing to not to get up to go to the bathroom due to her pain as opposed to experiencing involuntary loss of bladder function. (Doc. No. 88-5 at 3; Doc. No. 81-5 at 77:20–77:23.)  Kachinske did not believe that Winslow needed to return to the emergency room but told Latvala that he could call Captain Thompson to determine if Winslow was fit for jail.  (Doc. No. 88-5 at 3; Doc. No. 81-10 at 35:15–36:4; Doc. No. 81-5 at 74:17–74:25.)  Latvala then called Thompson who did not indicate that Winslow should return to the emergency room.[4]  (Doc. No. 88-5 at 3; Doc. No. 81-10 at 36:21–36:25; Doc. No. 81-11 at 16:18–18:11.)  Instead, Thompson told Latvala to give Winslow adult diapers.  (Doc. No. 88-5 at 3; Doc. No. 81-11 at 24:8–24:14.)

At approximately 10:07 a.m., Slettom delivered adult diapers to Winslow and a sheet to cover herself.  (Doc. No. 88-5 at 2.)  Winslow screamed at Slettom that she wanted to return to the emergency room and wanted to shower.  (*Id.*)  At approximately 12:50 p.m., Slettom returned to Winslow's cell to help her get up to shower.  (*Id.*)  Winslow, once again, "[i]nsisted [that Slettom] call an ambulance" and stated that GICH "should run 100 tests until they figure out what's wrong with her" and that "it's her right to go [to GICH] 10 times a day if that's what it takes."  (*Id.*)  Slettom offered to bring Winslow a washcloth,

---

[4] Thompson's testimony conflicts with Latvala's testimony.  Latvala stated that Thompson told him that if GICH determined that Winslow was fit for jail by discharging her, then Winslow was fit for jail.  (Doc. No. 81-10 at 36:21–36:25.)  Thompson, however, testified that because he is not trained to determine whether an inmate is medically fit for jail, he advised Latvala "to call ACH back" to determine if she was medically fit for jail because ACH is contracted to make that determination for the Jail.  (Doc. No. 81-11 at 17:1–18:11.)  Latvala testifies that Thompson never told him to call ACH back to make that determination, and he never called ACH back.  (Doc. No. 81-10 at 37:8–37:22.)

soap, and towel to wash herself, but Winslow declined, "stating she had to go to the ER."
(*Id.*)  Throughout the afternoon, Winslow was given more water and another ice pack.  (*Id.*)
At approximately 10:00 p.m., Winslow complained to Nelson that she could not roll over
or move.  (*Id.*)  Nelson reported that Winslow was making very slow movements and was
able to move more than she claimed she could.  (*Id.*)

### D.    Monday, March 25—Winslow's Court Appearance

At approximately 4:56 a.m., Nelson noted that Winslow was "yelling that it was too
hot in her cell." (Doc. No. 88-5 at 2.)  Sergeant Frechette noted at the start of his shift, that
Winslow was lying on the floor of her cell unclothed.  (Doc. No. 88-6 at 3.)  At 6:13 a.m.,
Officer Olson logged the following information about Winslow:

> Told her that [she] needs to get moving and get dressed along
> with cleaning her cell that smells of urine.  She said she needs
> to go to the bathroom[.]  I told her that I'd help but she needs
> to pick up her used depends diapers and garbage.  She said she
> does not need help[.]  I told her to get moving [because] she
> has court today and I am not gonna be dealing with her mess
> all morning.

(Doc. No. 88-5 at 2.)  Approximately one hour later, Olson logged the following entry:

> Since Winslow rolls around on [the] floor [and] refuses any
> help to get her dressed, I cleaned her cell and helped her put a
> shirt on.  I took out her sheets and blanket for they were full of
> urine.  She wanted the wheelchair and I told her she needs to
> get dressed.  Gave her breakfast and told her to not throw it on
> the floor for I just cleaned it.

(*Id.*)

Jail video shows Olson dragging Winslow, who was lying face down on the floor,
out of her cell and into the dayroom at 8:54 a.m.  (Doc. No. 89 at 3-25-19, Echo Dayroom

(1) 08:54:01–08:56:32.)  Approximately ten minutes later, Olson, Frechette, and Officer Imbleau can be seen lifting Winslow up into the wheelchair so that she could attend court. (*Id.* at 09:03:11–09:09:44; Doc. No. 88-5 at 2; Doc. No. 88-6 at 3.)  Registered Nurse Pellersels can be seen holding the wheelchair in place.  (Doc. No. 89 at 3-25-19, Echo Dayroom (1) 09:03:11–09:09:44; Doc. No. 88-24 at 73:7–73:9.)  Winslow attended her court hearing and was released on her own recognizance for the local charges but held for the warrant out of Hennepin County.  (Doc. No. 88-5 at 2; Doc. No. 88-6 at 3.)  At 3:41 p.m., Olson logged that Winslow had "[s]lid off the wheelchair and layed on the floor." (Doc. No. 88-5 at 1.)  At 5:16 p.m., Winslow was "[s]till rolling around on [the] floor," and Winslow asked to be pulled by her legs into her cell, which Olson did.  (*Id.*)

### E.    Tuesday, March 26—Winslow's Third Emergency Room Visit

At approximately 6:00 a.m. the following morning, Frechette observed Winslow sleeping on the floor of her cell; shortly thereafter, Winslow refused breakfast.  (Doc. No. 88-28 at 39:21–41:4; Doc. No. 88-5 at 1; Doc. No. 88-6 at 3.)  At approximately 8:43 a.m., Frechette logged that he had observed that Winslow's breathing seemed to be labored, so he asked Pellersels to come check Winslow's vitals.  (Doc. No. 88-6 at 3; 88-5 at 1; Doc. No. 88-28 at 41:5–44:25.)  Pellersels's medical assessment from around that time notes that Winslow had been lying on the floor on her left side with no significant movement since the day prior and that Winslow reported that she hurt all over.  (Doc. No. 88-7 at 10; Doc. No. 88-5 at 1.)  Winslow's vitals were reported as follows: oxygen ("92%"), heart ("112"), blood pressure ("140/80"), temperature ("97.5"), and respirations ("22").  (Doc. No. 88-7 at 10.)  Pellersels also noted that Winslow had "significant chapped lips."  (*Id.*)

9

Shortly after her medical assessment, Pellersels relayed her report by phone to Kachinske who directed her to get a release of information from Winslow so that they could request emergency room records from GICH. (*Id.*; Doc. No. 88-24 at 109:20–110:8.)

Approximately three hours later, at 12:03 p.m., Frechette logged that Winslow had "refused her [] lunch tray, stating that she can't get up and needs medical attention." (Doc. No. 88-5 at 1.) Frechette informed Pellersels of Winslow's refusal to eat and request for assistance. (*Id.*) Only then did Pellersels return to Winslow's cell to get a release of information and more background on Winslow. (*Id.*) Frechette ordered Winslow a liquid diet because she was unable to get up to eat. (Doc. No. 88-6 at 3.) Eventually, GICH faxed medical records to the Jail, which were printed at 12:45 p.m. (Doc. No. 88-15.)

At approximately 1:43 p.m., Olson offered to help move Winslow. (Doc. No. 88-6 at 5.) After failed attempts to move Winslow on her own, Olson radioed for help and also requested that Pellersels come check on Winslow again. (*Id.*) At Olson's request, Pellersels returned to Winslow's cell at approximately 1:47 p.m., took Winslow's vitals, and requested that someone call an ambulance to have Winslow further evaluated. (*Id.*) According to Pellersels's note, Winslow's vitals were as follows: oxygen ("88%"), heart ("123-132"), blood pressure ("98/52"), temperature ("97.5"), respiration ("42"). (Doc. No. 88-7 at 10.) Pellersels also noted that Winslow appeared "sick looking," that her skin was "cool and clammy, pale in appearance," and her "speech [was] slurred, and ha[d] audible stridor." (*Id.*) Frechette called for an ambulance at approximately 1:53 p.m. (Doc. No. 88-6 at 4.)

The ambulance arrived at the Jail within minutes, and first responders were in Winslow's cell by 2:07 p.m. (Doc. No. 88-10 at 2.) The ambulance record states that Winslow "started to have difficulty breathing since yesterday." (*Id.* at 1.) Winslow's vitals were as follows: oxygen ("78%"), pulse ("126"), blood pressure ("88/50"), respiration ("42"). (*Id.* at 2.) Winslow was taken by ambulance back to the emergency room. (*Id.*)

Winslow arrived at GICH at approximately 2:42 p.m. (*Id.*) Shortly thereafter, she was seen by a medical doctor who ordered labs and a chest x-ray. (Doc. No. 88-2 at 12, 14.) The x-ray revealed a lung infection. (*Id.* at 14.) As a result, the doctor ordered two blood cultures before administering antibiotics. (*Id.*) At approximately 3:12 p.m., Winslow was diagnosed with septic shock. (*Id.* at 17) As a result, Winslow was airlifted to St. Mary's Essentia Hospital, a higher acuity facility. (*Id.* at 19.) There, Winslow was found to have acute respiratory failure and severe septic shock. (Doc. No. 88-11 at 5.)

**F.      Winslow's Death and this Action**

Winslow died at 7:52 a.m. on March 27, 2023. (*Id.* at 13.) An autopsy showed that she died from sepsis due to bacterial endocarditis—"a known complication of intravenous drug abuse." (Doc. No. 88-12 at 1.)

In November 2023, Pierce filed a six-count Amended Complaint against Itasca County, and sixteen of its employees or agents; ACH, and three of its employees or agents; and GICH and one of its employees or agents. (Doc. No. 39.) In the Amended Complaint, Pierce brings two section 1983 claims, one against the sixteen individual defendants for failure to provide adequate medical care (Count I) and another against Itasca County for failure to train (Count II). (Doc. No. 39 ¶¶ 56–67.) Pierce also brings a wrongful death

claim (Count III) and a survival action claim (Count VI) against the Itasca County Defendants. (*Id.* ¶¶ 68–72, 83–87.)

## DISCUSSION

The Itasca County Defendants now move for summary judgment of all four claims. (Doc. No. 78.) The Court grants the motion in part and denies the motion in part.

Courts grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it affects the outcome of the suit, and a dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). To survive the motion, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. The Court views the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## I.    Count I: Section 1983 Liability Against Individual Defendants

In the Amended Complaint, Pierce alleges a deliberate indifference claim against the sixteen individual defendants (Count I). (*See* Am. Compl. ¶¶ 56–58.) In her opposition brief, however, Pierce limits the scope of this claim to only the following five Itasca County Defendants: Thompson, Latvala, Frechette, Olson, and Nelson (together, the "Remaining Individual Defendants"). (Doc. No. 87 at 12.) Based on the evidence presented and evaluating the record in the light most favorable to Pierce, the Court concludes that a reasonable jury could find the Remaining Individual Defendants liable for the deliberate

indifference claim asserted in Count I concerning their actions after Winslow's return from her second emergency room visit.[5]

Pretrial detainees, like Winslow, have a clearly established constitutional right "to be free from deliberately indifferent denials of emergency medical care." *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017) (quotation omitted). A plaintiff asserting a deliberate indifference claim must show that the inmate "suffered from an objectively serious medical need," and that one or more defendants "had actual knowledge of that need but deliberately disregarded it." *Id.* at 425 (quotation omitted). A plaintiff satisfies the objective prong of this analysis if the detainee's medical need "is supported by medical evidence, such as a physician's diagnosis, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* (quotation omitted). As for the subjective prong of the analysis, a plaintiff must show "a mental state akin to criminal recklessness and neither [a showing of] negligence nor gross negligence are sufficient." *Id.* (quotation omitted); *see also Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (stating that under the subjective prong, a plaintiff "must show that the [defendants] recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk") (emphasis in original).

The Remaining Individual Defendants do not dispute that Winslow suffered from an objectively serious medical need. (Doc. No. 93 at 3.) Thus, the Court focuses on the

---

[5] Pierce does not contest the motion for summary judgment concerning the deliberate indifference claim against the other eleven individual defendants employed by Itasca County. Accordingly, the Court grants the motion as it relates to these defendants.

subjective component—whether the Remaining Individual Defendants knew of Winslow's objectively serious medical need but deliberately disregarded it.

### A.    Knowledge of a Substantial Risk of Harm

A defendant's knowledge of a substantial risk of harm can be proven through circumstantial evidence. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). For instance, a factfinder may infer "that [a defendant] had actual knowledge of a serious medical need . . . from the very fact that the risk was obvious." *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 481–82 (8th Cir. 2008). Knowledge that an inmate with ongoing medical needs was refusing meals and lying in the same position without moving for hours presents an obvious risk of harm. *See Letterman v. Does*, 789 F.3d 856, 863 (8th Cir. 2015). Based on the record presented, a reasonable jury could conclude that each of the Remaining Individual Defendants had actual knowledge of Winslow's need to return to the emergency room, and the Court briefly summarizes the evidence concerning each defendant's knowledge.

Thompson knew from his March 24 call with Latvala that Winslow was urinating on herself, and that Latvala was questioning whether Winslow was fit for jail. (Doc. No. 88-26 at 18:16–19:24, 30:23–31:15; Doc. No. 88-5 at 3.) In addition, Thompson knew that Winslow was spending her entire time on the floor due to the pain that she was in and was unable to get up. (Doc. No. 88-26 at 31:16–32:21.) Thompson also testified that he advised Latvala "to call ACH" to determine if Winslow should stay in the Jail, further showing his knowledge of her medical state. (Doc. No. 81-11 at 17:1–18:11.)

Likewise, Latvala knew that Winslow had been ordered by Dr. Schamber to return to the emergency room a second time on March 23. (Doc. No. 88-27 at 16:14–16:20; Doc.

No. 88-6 at 11.)  By March 24, Latvala had reviewed Winslow's March 23 discharge instructions, which directed Winslow to return to the emergency room if she exhibited loss of bladder function, and Latvala knew that Winslow had been urinating on herself after her return from the second emergency room visit.  (Doc. No. 88-27 at 25:20–26:14.)  He also knew that Winslow could not get up on her own due to her pain.  (*Id.*)  His decision to contact Kachinske and Thompson to determine whether to return Winslow to the emergency room could support a reasonable inference that Latvala knew of Winslow's need for emergency medical treatment.  (*Id.* at 26:15–27:20, 35:10–36:8.)

For his part, Frechette learned—on March 25—that Winslow had been in the emergency room twice over the weekend.  (Doc. No. 88-28 at 20:23–21:13.)  He also observed Winslow laying on the floor of her cell unclothed and knew she was unable to get herself up off the floor.  (*Id.* at 19:18–20:1, 29:24–30:18.)  Frechette knew that Winslow had spent the entirety of March 25, apart from her court appearance, lying on the floor.  (*Id.* at 32:17–33:14, 34:3–34:8.)  By March 26, Frechette learned that Winslow was still on the floor and that she had refused breakfast.  (*Id.* at 39:21–40:18.)  He also observed Winslow experiencing labored breathing and contacted Pellersels to check on her.  (*Id.* at 41:16–43:23.)  Later, Frechette learned that Winslow refused to eat lunch and contacted Pellersels to check on Winslow again because she seemed in distress, stated that she could not get up, and requested medical attention.  (*Id.* at 51:6–52:22.)

Olson learned—also on March 25—that Winslow had been to the emergency room twice and was lying on the floor urinating on herself because she could not get up due to her back pain.  (Doc. No. 88-29 at 10:12–11:20, 14:11–14:17.)  She also knew that

Winslow was removing her clothes because they were soiled, and she was hot. (*Id.* at 25:3–25:14.) By March 26, Olson knew that Winslow was still lying on the floor in her cell and was not rolling around as much as she had been the previous day. (*Id.* at 14:18–14:22, 31:24–32:10.) Olson also testified that she knew that Winslow needed medical attention due to her declining state. (*Id.* at 17:14–18:10, 32:15–32:22.)

Finally, Nelson knew that Winslow had come to jail straight from the emergency room and was complaining of back pain. (Doc. No. 88-30 at 20:5–20:7, 22:13–22:23.) By March 24, she also knew that Winslow had been removing her clothing, urinating on herself, complaining that it was too hot in her cell, and lying on the jail floor because she was unable to get up on her own. (*Id.* at 29:16–29:21, 40:5–40:10, 44:5–44:9, 46:3–46:14.) Nelson also knew that Winslow exhibited this behavior after returning from a second visit to the emergency room. (*Id.* at 45:10–45:17.)

Viewing this evidence and inferences to be drawn this evidence in the light most favorable to Pierce, a reasonable jury could conclude that Winslow's need to be returned to the emergency room was so obvious that each of the five Remaining Individual Defendants must have recognized a substantial risk of harm existed if Winslow was not returned to the emergency room.

### B.    Knowledge of Inappropriate Conduct

A defendant's knowledge "that their conduct was inappropriate in light of [the] risk" may also be proven through circumstantial evidence. *Krout*, 583 F.3d at 567. For example, "an obviously inadequate response may create an inference that the officer recognized the inappropriateness of his conduct." *Ryan*, 850 F.3d at 425–26 (quotation omitted). In

addition to determining the appropriateness of a defendant's responses, a jury would necessarily have to consider the reasonableness of the defendant's reliance on information provided by a medical professional. *See Schaub v. VonWald*, 638 F.3d 905, 918 (8th Cir. 2011) ("Contracting out prison medical care does not relieve the [county] of its constitutional duty to provide adequate medical treatment to those in custody."); *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) ("A prison official may rely on a medical professional's opinion if such reliance is reasonable."); *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.")  The appropriateness of a response and reasonableness of a person's reliance on medical professionals presents a quintessential jury question.  Nevertheless, the Court briefly addresses the responses of the Remaining Individual Defendants and concludes that a reasonable jury could find their conduct inappropriate and their reliance unreasonable.

Despite the knowledge that the Remaining Individual Defendants had concerning Winslow's condition, and despite Winslow's repeated requests to return to the emergency room, she was not returned to the emergency room, but provided instead with water, ice packs, pain medication, and adult diapers.  (Doc. No. 88-5 at 2–3; Doc. No. 81-11 at 24:8–24:14.)  Indeed, Winslow's discharge after her second emergency room visit included directives that jail staff contact emergency medical providers if Winslow exhibit "new concerning symptoms" or if she "[experienced] trouble breathing, confusion, [became] very drowsy or [had] trouble awakening, [experienced] fainting or loss of consciousness,

rapid or very slow heart rate, or loss of bowel or bladder control." (Doc. No. 88-2 at 11; Doc. No. 88-9 at 4–5.) The record does not contain evidence that any of the Remaining Individual Defendants checked Winslow's vitals or contacted the emergency medical providers as directed by the discharge instructions. A reasonable jury could conclude from this absence of evidence that the Remaining Individual Defendants failed to closely follow the discharge instructions, this fell short of an appropriate response, and shows a lack of reliance on medical professionals.

The record does include evidence of some potentially helpful responses from the Remaining Individual Defendants. For instance, Slettom offered to bring Winslow a washcloth, soap, and towel, but Winslow declined, requesting instead to go to the emergency room. (Doc. No. 88-5 at 2.) Also, in response to Winslow's inability to eat, Frechette ordered Winslow a liquid diet. (Doc. No. 88-6 at 3.) These responses, however, should be balanced against evidence of potentially harmful or negative responses, such as evidence that Olson dragged Winslow, face down on the floor, out of her cell and into the dayroom on March 25 in response to Winslow's inability to stand or sit up on her own. Likewise, Olson, Frechette, and Imbleau lifted Winslow up into a wheelchair for her remote court appearance. (Doc. No. 88-5 at 2; Doc. No. 88-6 at 3; Doc. No. 89 at 3-25-19, Echo Dayroom (1) 08:54:01–08:56:32, 09:03:11–09:09:44.) Finally, on March 26, Frechette observed Winslow's breathing to be labored, and asked Pellersels to check Winslow's vitals. (Doc. No. 88-6 at 3; 88-5 at 1; Doc. No. 88-28 at 41:5–44:25.) Pellersels noted that Winslow had no significant movement since the day prior, and recorded Winslow's vitals as follows: respirations at 22, oxygen at 92%, tachycardic heart rate, and

significantly chapped lips. (Doc. No. 88-7 at 10; Doc. No. 88-5 at 1.) Nevertheless, an ambulance was not called until more than four hours later. (Doc. No. 88-5 at 1; Doc. No. 88-6 at 5.)

This evidence and the inferences that can be reasonably drawn from this evidence, taken together, present genuine issues of material fact concerning whether the Remaining Individual Defendants responded appropriately and whether their reliance on any medical professionals was reasonable. Thus, the Court denies summary judgment of the deliberate indifference claim against the five Remaining Individual Defendants.

## II.    Count II: Section 1983 (*Monell/Canton*) Liability Against Itasca County

In Count II of the Amended Complaint, Pierce alleges a Section 1983 claim against Itasca County. (Am. Compl. ¶¶ 59–67.)[6] Itasca County argues that the Court should grant summary judgment on this claim because the record does not establish the elements of municipal liability and because Pierce makes no argument in opposition to the motion for summary judgment in relation to this claim. (Doc. No. 93 at 11.) The Court agrees. Pierce's failure to oppose this basis for summary judgment constitutes waiver of the claim. *See Satcher v. Univ. Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) (concluding that "it [i]s not the District Court's responsibility to sift through the record to see if, perhaps, there was an issue of fact" and "failure to oppose a basis for summary judgment constitutes waiver of that argument"); *see also Dale & Selby Superette & Deli v.*

---

[6] A county may not be held liable for a constitutional violation under Section 1983 unless the violation resulted from "(1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019) (quotation omitted).

*U.S. Dep't of Agric.*, 838 F. Supp. 1346, 1348 (D. Minn. 1993) ("Just as a party is expected to offer its evidence in support of or in opposition to a motion for summary judgment or lose the right to have that evidence considered, the failure to raise an issue in opposition to a motion for summary judgment operates [as] a waiver." (quotation omitted)). Thus, the Court grants summary judgment as to the Section 1983 claim against Itasca County.

### III.    Counts III and VI: Wrongful Death and Survival Action Claims

In Count III and VI of the Amended Complaint, Pierce alleges a state-law wrongful death claim and seeks to recover wrongful death damages against the Itasca County Defendants. (Am. Compl. ¶¶ 68–72, 83–87.) The Itasca County Defendants argue that the Court should grant summary judgment on these counts because the Remaining Individual Defendants are entitled to official immunity. (Doc. No. 80 at 26–29.) The Court's analysis of official immunity overlaps with its analysis of deliberate indifference, and, in light of the Court's decision denying summary judgment on Count I, the Court also denies the summary judgment motion relating to Counts III and VI.

Official immunity "protects public officials from the fear of personal liability that might deter independent action and impair effective performance of their duties." *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 678 (Minn. 1988). Officials, however, are not immune from liability for malicious wrongs. *Hassan v. City of Minneapolis*, 489 F.3d 914, 920 (8th Cir. 2007) (noting that a malicious wrong is one that an official "has intentionally committed an act that he or she had reason to believe is prohibited"); *see also Graham v. Barnette*, 5 F.4th 872, 892 (8th Cir. 2021) (noting that, under Minnesota law, "a public official is entitled to official immunity when his conduct requires the exercise of discretion

20

or judgment and there is no evidence that he acted maliciously or in bad faith"). In other words, to prevail under the doctrine of official immunity, public officials must demonstrate that their conduct meets one of three tests:

> (1) that the conduct was "objectively" legally reasonable, that is, legally justified under the circumstances; (2) that the conduct was "subjectively" reasonable, that is, taken with subjective good faith; or (3) that the right allegedly violated was not clearly established, that is, that there was no basis for knowing the conduct would violate the plaintiff's rights.

*Erickson v. Pope Cnty.*, No. 19-CV-3061 (SRN/LIB), 2022 WL 17411091, at *41 (D. Minn. May 6, 2022) (quoting *Gleason v. Metro. Council Transit Operations*, 563 N.W.2d 309, 318 (Minn. Ct. App. 1997), *aff'd in part*, 582 N.W.2d 216 (Minn. 1998)).[7] Conduct that "rises to the level of deliberate indifference, in violation of the Constitution, cannot be either objectively reasonable or subjectively reasonable." *Id.* (citing *Fisher v. State, Dept. of Corr.*, No. A06-76, 2007 WL 1673642, at *6 (Minn. Ct. App. June 12, 2007) for the proposition that disputed issues of material fact concerning deliberate indifference preclude application of official immunity).

As noted in Section I above, a reasonable jury could find the Remaining Individual Defendants liable for deliberate indifference asserted in Count I. This determination necessarily precludes summary judgment on Counts III and VI based on official immunity.[8]

---

[7] The Itasca County Defendants make no argument that the right allegedly violated was not clearly established. Thus, the Court only considers the first two of these three options.

[8] Unlike the arguments raised in response to Count II, the Itasca County Defendants do not make any independent argument that the record fails to establish Itasca County's municipal

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT the Itasca County Defendants' motion for summary

judgment (Doc. No. 78) is GRANTED IN PART and DENIED IN PART as follows:

1.  Summary judgment is GRANTED on Counts I, III, and VI, as against Defendants Shawn Racine, David Hill, Sammy Imbleau, Chris Kebart, John Linder, Amy Slettom, C. Ploetz, D. Roberts, D. Ross, E.R., and S.R;

2.  Summary judgment is GRANTED on Counts II as against Defendant Itasca County;

3.  Summary judgment is DENIED on Count I as against Defendants Lucas Thompson, David Frechette, Chad Latvala, Erin Nelson, and Marnie Olson; and

4.  Summary judgment is DENIED on Counts III and VI as against Defendants Itasca County, Lucas Thompson, David Frechette, Chad Latvala, Erin Nelson, and Marnie Olson.

Dated: January 23, 2025                                     /s/ *Jeffrey M. Bryan*
                                                           Judge Jeffrey M. Bryan
                                                           United States District Court

---

liability regarding Counts III and VI. Instead, they only argue that because the Remaining Individual Defendants are immune, there can be no viable claim against Itasca County under the doctrine of vicarious immunity. (Doc. No. 80 at 29.) Given the Court's decision denying the summary judgment motion as to Counts III and VI against the Remaining Individual Defendants, the Court necessarily also denies the summary judgment motion as to Counts III and VI against Itasca County.